# SUPREME COURT.

## JANUARY TERM, 1845.

9   3
51a 365
9   3
a156  84

GABRIEL S. CHOUTEAU vs. PIERRE, (of color.)

1. In a suit for freedom, it is a good objection to a juror, that he would feel bound by his conscience to find a verdict in favor of the plaintiff, notwithstanding the law should hold him in slavery.

2. It is not necessary to show any positive enactment of law in order to establish the existence of slavery.

3. The existence of slavery *in fact* being established, it devolves upon the plaintiff, he being a negro, to show the law forbidding it.

4. The courts of this State will judicially take notice of the laws of France and Spain, which were in force in this State while a part of the territory of those governments.

5. They will not take notice of the laws of Canada, but the legality of slavery under those laws, is a question of fact for a jury.

6. The ordinance of 1787 for the government of the north-western territory, had no force in any post or precinct in that territory in the possession of Great Britain, prior to the first of June, 1796. A slave held within any such post, prior to that time, acquired no right to his freedom by virtue of such ordinance.

## APPEAL from St. Louis Circuit Court.

SPALDING & TIFFANY, *for Appellant.*

### POINTS AND AUTHORITIES.

1. The question whether slavery existed in Canada, was a fact for the jury, which the court excluded from from their consideration, by its instructions.

2. That instruction can be justified only on the supposition that there was *no evidence* whatever of slavery in Canada, or not sufficient to go to the jury.

3. There was sufficient evidence to be left to the jury: 3 Mo. Rep. 544. That slavery of the blacks has been tolerated in all the American colonies, and no legislative act exists introducing it.

4. The holding of plaintiff's mother as a slave in a portion of the North-west territory, by British subjects, before the same was surrendered to the American government by Great Britain, and before the American laws were ever in force there, could not free her. That portion of the country was retained, because the American government failed on their side to fulfil the treaty. The British troops were therefore instructed to hold the western posts, and the government of the United States was officially informed, that the posts were. and would be held for that purpose. This occupation was legalized by the subsquent action of the government. When the Constitution was formed and went into operation, his Britannic Majesty was informed that the treaty was fulfilled on our part, and he then stipulated for the surrender of the posts: 1 vol.Brown's laws of U. S., 206. Speech of Gen. Washington to Congress of 7th December, 1796.

GEORGE W. NABB, *for Appellee.*

### POINTS AND AUTHORITIES.

1. That Rose, the mother of the appellee, being a native of Montreal, Canada, a British province, she became thereby free, and the plaintiff entitled to his freedom. Law of slavery, by Wheeler, 348, 349, 406.

2. That Rose having resided in the town of Michilimacinac, in 1794 in Prairie du Chien, 18 months or two years after that time whether same places were a part of the British possessions, or a part of the Territory north-west of the river Ohio, subject to the ordinance of Congress of 1787—and the appellee was born of her subsequently, he is entitled to his freedom. Winny vs. Whiteside, 1 Mo. R. 334.—Merry vs. Tiffin, 1 Mo. Rep. 520. Hays vs. Dashel, — vol. Mo. Rep. Law of slavery. p. 356.

3. If the mother of Rose ever had been a slave and resided in Prairie du Chien after the year 1787, she became emancipated, and the appellee being born of her subsequently to that time, became free. Same authorities cited in No. 2. Law of slavery, by Wheeler, p. 355, 339.

4. That if Rose was born in Canada, a province of the British government, there was no evidence to show that slavery existed in that province. And there being no evidence to prove that she was a negro or a woman of color—that Pierre, the appellee, being her son, is entitled to his freedom, vide record.

5. That the instructions of the court were properly refused, as offered

by the defendant's counsel—and that the instructions of the court, that slavery or involuntary servitude did not exist in the Canadas, was correct—and that Rose being the mother of the appellee, and a native of Canada, he is thereby entitled to his freedom.

SCOTT, J., *delivered the opinion of the Court.*

This was a suit for freedom, brought by Pierre against Chouteau, in which a judgment was rendered for Pierre, to reverse which this appeal is prosecuted.

The petition of Pierre sets forth that his mother, Rose, was a negress, and was born in Montreal, in Lower Canada, about the year 1768.— That in the year 1791, or thereabouts, his mother was taken from Montreal to Prairie du Chien, in the North-west Territory of the United States, by one Stork, where she remained until his death in and about the year 1794, rendering service to him and his family. That about the year 1795, Andrew Todd took Rose, his mother, from Prairie du Chien, and brought her to St. Louis, where she was sold in October of that year, to one Didier, a priest; and in August, 1798, she was sold by Didier to Auguste Chouteau, with her two children, Didier conveying the slaves to Chouteau without warranty of title, though Todd conveyed to Didier with warranty. That while his mother was in the service of Chouteau, she had several children, amongst whom was the petitioner. That after the death of A. Chouteau, the petitioner came into the possession of the petitioner in error, G. S. Chouteau, by whom he is held in slavery.

Pierre based his right to freedom on two grounds. First, That his mother, Rose, was born free, being a native of a British province, in which slavery was not tolerated. Secondly, That if his mother was a slave by her residence at Prairie du Chien, she became free by virtue of the ordinance of 1787, for the government of the North-western Territory.

On the part of Pierre, evidence was introduced conducing to prove that Rose was a slave or servant, and her residence at Mackinaw and Prairie du Chien about the time stated in the petition. During the period of Rose's detention at Prairie du Chien, that post was in the possession of British subjects. It was shewn in evidence that Pierre was born in St. Louis. A conveyance of Rose, who it appears was acquired from the representatives of the estate of John Stork, dated Oct. 1795, and executed by Andrew Todd, a merchant of Montreal, in Canada, to one Didier, a curate of the parish of St. Louis, was read

in evidence; also, a conveyance of Rose and her two children mad⌐ by Didier to A. Chouteau. This conveyance was dated in Aug., 1798·

The defendant below gave evidence tending to show the actual existence of slavery in Canada in the year 1786—that slaves were recognized as property, and subject to be sold ; that Rose, the mother of Pierre, was sold as a slave in Canada. A treaty and documents relative to the North-western posts by Great Britain, were read in evidence.

The court excluded from the consideration of the jury, all the evidence tending to prove the existence of slavery in Canada, to which an exception was taken.

The following instructions, asked by the plaintiff in error, were refused by the court : "1. That the facts that the mother of the plaintiff was born and held as a slave in Canada, and was at Mackinaw and Prairie du Chien, while these places continued in the possession of the British government, do not, nor does either of them entitle the plaintiff to his freedom. 2. If the jury find from the evidence, that slavery existed in Canada, that the mother of the plaintiff was there held as a slave, the fact of her residence in Canada, or other places at the time in the possession of the British government, and before the surrender of these places, does not entitle the plaintiff to his freedom."

Exceptions were taken to the refusal of these instructions.

The court instructed the jury that slavery or involuntary servitude never did exist in either of the Canadas. An exception was taken to the giving this instruction.

Before the jury were sworn, the defendant below asked leave to inquire of the jurors, when sworn to answer questions, if any of them felt bound in conscience to find a verdict in favor of the freedom of the plaintiff, notwithstanding the law might hold him in slavery. The court refused to permit this question to be put to the jury, to which refusal an exception was taken.

The first point we will notice, is that growing out of the refusal of the court to allow a juror to be asked if he felt in conscience bound to find a verdict in favor of the freedom of the plaintiff, notwithstanding the law might hold him in slavery. We cannot well conceive how a juror could be considered as indifferent between the parties, who labored under the bias supposed by the question. Nor do we see what objection can be urged against its propriety. An affirmative answer does not tend to the disgrace or infamy of the juror. We know that there are many in our sister States who do entertain such opinions; they may find their way amongst us, and so long as slavery is tolerated in this

State, our courts should be clothed with the power of preventing our laws from being openly set at defiance, and under the pretence of administering justice, to permit jurors to trample in the dust the rights of property of our citizens. No loyal or faithful citizen will object to answering the question. He will fully appreciate the motives which prompt it, and while he laments the cause which renders such an inquiry necessary, he yields a ready obedience to the law which prescribes such a test, in order to ascertain his fitness as a juror in cases involving the right to property of the species claimed by the defendant in error.

We are not without authority on this question. In the case of Mima Queen vs. Hebburn, 7 Cranch, 290, which was a suit for freedom, a juror was called, who, upon being questioned, avowed his detestation of slavery to be such that, in a doubtful case, he would find a verdict for the petitioner, and that he had so expressed himself in the very case, and that if the testimony were equal he should certainly find a verdict for the petitioner. The court which tried the cause, instructed the triers that he did not stand indifferent. This was assigned for error in the supreme court, and chief justice Marshall, in delivering its opinion, observed, that jurors should be superior to every exception, they ought to stand perfectly indifferent between the parties, and that the court below exercised a sound discretion in not permitting the juror to be sworn. The objection now under consideration is much more forcible than that in the preceding case, for it supposes that the juror will not find a verdict for one of the parties, let the law and the evidence be as it may ; whereas, in the other, the juror had only declared that in case of a doubt, or equipoise of the testimony, the claimant should have the benefit of it. On another occasion, chief justice Marshall, speaking of the qualifications of jurors, remarks : "I have always conceived, and still conceive, an impartial jury as required by the common law, and as secured by the Constitution, must be composed of men who will fairly hear the testimony which may be offered to them, and bring in their verdict according to that testimony, and according to the law arising on it : this is not to be expected—certainly the law does not expect it, where the jurors, before they hear the testimony, have deliberately formed and delivered an opinion. The jury should enter upon the trial with minds open to those impressions which the testimony and the law of the case ought to make, not with those preconceived opinions which will resist those impressions."

The instruction given to the jury, viz : " that slavery or involuntary

servitude does not and never did exist in either of the Canadas," is complained of by the plaintiff in error. There was some evidence conducing to show that slavery did actually exist in Canada at the time the mother of the plaintiff (Pierre) was detained in that country; and the instruction can only be predicated on the idea that the proof of the existence of slavery can only be established by positive enactment, an idea entirely inconsistent with the history of the introduction of slavery into America. In the colonies owned by European powers on this continent, the existence of slavery was recognized by many enactments, but no legislative memorial has been discovered which expressly authorized the subjecting of the African race to bondage. The Kingdoms of Europe possessing colonies in America, from motives of cupidity supplied them with African slaves, and this commerce of the mother country was the foundation, and the right of the colonists to hold the slaves in servitude. Slavery seems to have had no other origin in America. So ardently did the English nation engage in this commerce, that it was persisted in, although against the remonstrances of a colony into which the slaves were introduced. England was delighted with the article of the treaty of Utrecht, by which she obtained the *asiento* or contract for supplying the Spanish colonies with negroes, which had formerly been enjoyed by France. Spain it seems was the first European kingdom to introduce negroes into America, with a view of relieving the Indians from servitude. The territory of which this State composed a part, has been subject to both the kingdoms of France and Spain; and our courts take judicial notice of the laws which prevailed here under their respective governments. Canada, prior to the treaty of 1763, was a colony of France. We know that no law ever existed here under the French and Spanish governments, which expressly authorized the slavery of negroes, although such slavery did in fact exist.— Nor has such a statute been found in any of the British colonies, although slavery existed in all of them. Seville vs. Chritien, 1 Con. Louisiana Rep. 367. Robertson's History of America. Margaret vs. Chouteau, 3 Mo. Rep. 375.

There was evidence conducing to show, that slavery did in fact exist in Canada, and if there was a law prohibiting it, by what authority did the court take judicial notice of that law?

The statute under which Pierre sues, he being a negro, requires that he should prove his right to freedom. Then it would seem that it devolved on him to show the law forbiding negro slavery; for from the preceding account of the origin of slavery in America, a court would

not be warranted in saying, that institution was illegal in places where it actually existed, for want of a law expressly authorizing it.

As to the ground on which Pierre bases his right to freedom, growing out of the fact of his mother being held as a slave in the posts of the northwestern territory, contrary to the ordinance of 1787, which prohibited slavery within its limits, we are of opinion that the possession of these posts by British subjects, at the time of her detention at them, prevented the operation of the ordinance within their limits and jurisdiction. It is assumed that the courts will take notice of the history of the country. Greenleaf's Evid. 7 Hardin's Rep. 98. Hart vs. Bodley. Treaties are a part of the supreme law of the land, and will be judicially noticed by our courts. By the definitive treaty of Paris, dated Sept. 3d, 1783, Great Britain stipulated to withdraw all her armies, garrisons and fleets from the United States, and from every post, place and harbor within the same. This treaty was not fulfilled on the part of Britain, she alledging as a justification of her conduct in this respect, a violation of other articles of the treaty, by the United States; this dispute was continued between the two countries until the 19th of Nov., 1794, when a treaty of amity, commerce and navigation was concluded between Great Britain and the United States. By the second article of this treaty, Great Britain stipulated to withdraw all her troops and garrisons from all posts and places within the boundary lines assigned by the treaty of peace to the United States; the evacuation took place on or before the —— of June, 1796; the United States extending in the meatime at their discretion, their settlements to any part within the said boundary line, except within the precincts or jurisdiction of any of the said posts. All settlers and traders, within the precincts or jurisdiction of said posts, were to continue in the unmolested enjoyment of all their property of every kind, and be protected therein. They were to be at full liberty to remain there, or remove with all or any part of their effects, and they were free to sell their houses, lands or effects, or to retain the property thereof, at their discretion; such of them as continued to reside in the said boundary lines, were not to be compelled to become citizens of the United States, or to take any oath of allegiance to the government thereof; but they were to be at full liberty to do so if they thought proper, and they were to make and declare their election within one year after the evacuation aforesaid. On the 7th December, 1796, General Washington, then President of the United States, in a speech, addressed to the two houses of Congress, informed them that the period during the late session, at which the appropriation was passed for carrying into effect the treaty of amity, commerce and navigation between

the United States and his Britannic Majesty, necessarily procrastinated the reception of the posts stipulated to be delivered, beyond the date assigned for that event.  As soon, however, as the Governor General of Canada could be addressed with propriety on the subject, arrangements were cordially and promptly concluded for their evacuation, and the United States took possession of the principal of them, comprehending Oswego, Niagara, Detroit, Michilimacinac and Fort Miami.  American State papers, p. 30, vol. 1; title, Foreign Relations.

Thus it appears that the northwestern posts were not, until after 1st June, 1796, surrendered by Great Britain—that her subjects within them owed no allegiance to our government—that they were protected in the enjoyment of their property, and that the United States restrained themselves from extending their jurisdiction within the said posts or precints, until after the period assigned for their surrender; thus clearly showing that before that period they claimed no jurisdiction in the said posts or precincts.  The foregoing provisions of the treaty of 1794, clearly show that the ordinance of 1787, for the government of the Northwestern Territory, never had any force or validity in the posts or precincts occupied by Great Britain.  It appears the mother of the plaintiff Pierre, was taken from Prairie du Chien to St. Louis before the period assigned for the surrender of the posts, and that during her detention at that place, it was in the possession of British subjects.— Then she could never have acquired any rights under the ordinance of 1787, and consequently the instructions asked by the plaintiff in error should have been given.

Judgment reversed and cause remanded.

TOMPKINS, J.

Whether the laws of Canada permitted slavery there, is a fact for a jury to find, and not for the circuit court of St. Louis to decide; these laws, if there be such, being foreign laws.