# CASES DETERMINED

## BY THE

# SUPREME COURT

### OF THE

# STATE OF MISSOURI

### AT THE

## APRIL TERM, 1900.

---

THE STATE v. MILLER, Appellant.

Division Two, May 8, 1900.

1. **Juror:** CIRCUMSTANTIAL EVIDENCE. It is not error to exclude from the panel a juror who on his *voir dire* answers that he will not convict a defendant on circumstantial evidence alone.

2. **Indictment:** MISSPELLING WORDS. A mere clerical error in the spelling of a word does not vitiate the indictment if the whole context discloses the word intended to be used. So that to hold that the words in the indictment "did make and assault" meant anything else than "did make an assault," would be to trifle with a serious matter. Besides, the words "make and" could be stricken out and a perfect indictment charging assault would remain, and such striking out is always allowable.

   **Impeachment:** REPUTATION AT PRESENT. A witness who has known the reputation of another witness for truth and veracity for nine years, and testifies that it has remained unchanged during that time down to the trial, is not incompetent to testify as to his reputation, nor can the inquiry be limited to the immediate present.

4. **Cross-Examination of Defendant.** Cross-examination of the defendant in a criminal case must be confined to the subject of the examination in chief, but it should not be confined to a mere categorical review of the matters stated in the direct examination.

5. **Murder:** CONSPIRACY: INSTRUCTION. The defendant and one Ferguson were jointly indicted for murdering Samuel Crow; and at the trial the court instructed the jury that they should convict defend-

(76)

State v. Miller.

ant of murder in the first degree if they found beyond a reasonable doubt that defendant alone murdered Crow, or that he and Ferguson did, or either of them did, the other being present aiding, abetting or assisting in the murder. *Held,* that this instruction did not authorize the jury to convict defendant on evidence against Ferguson, and was not therefore misleading as an attempt to hold defendant as a conspirator in a murder.

6. ———: SUFFICIENCY OF EVIDENCE. The evidence ·in this case is reviewed, and, though circumstantial, is held sufficient to sustain a conviction of murder.

Appeal from Holt Circuit Court.—*Hon. Gallatin Craig,* Judge.

AFFIRMED.

*G. W. Murphy, H. T. Alkire* and *R. B. Bridgmon* for appellant.

(1) The court erred in excluding Gray as one of the 40 jurors on the ground that he said he could not convict on circumstantial evidence alone. There is no law permitting such ground for excusing a juror. It would have been fair to the defendant, and no injury to the State, to have left Gray as one of the forty to be challenged by the State, if it seemed proper to them so to do, but his being excused without sufficient reason, was calculated to work injury to the substantial right of the defendant. Sec. 2614, R. S. 1899; State v. Man, 83 Mo. 589. (2) The indictment is insufficient, and fails to charge an assault. The charge, as made, that "defendant did make and assault," does not charge the making of an assault. The court can not say that the pleader may have meant "that the defendant did make an assault." Nothing can be taken by implication in a case of such grave importance as this. State v. Blan, 69 Mo. 317. (3) The court erred in permitting the defendant to be cross-examined on matters not brought out in the examination' in chief. The defendant was asked by his counsel: "Did you have anything to do whatever with the murder of Samuel Crow?" He answered, "I

did not, or know anything about it in the world?" Upon the basis of this question and answer, the court permitted the State to examine the defendant upon all the questions as to whether he wrote to Crow's daughter at Maitland; and what he said to Jim Ferguson about it, and whether or not, he, defendant, had used certain harsh epithets concerning Crow, etc. Such could only be unjustly injurious to the defendant and in breach of his legal right. Sec. 2637, R. S. 1899; State v. Brannam, 95 Mo. 19. (4) Instruction numbered three complained of by defendant was not justified by the evidence, and had a tendency to mislead the jury. It could not have been other than prejudicial to the defendant in that it authorized the jury to couple any traces of evidence that there 'seemed to be against the defendant with any evidence they found against Wm. Ferguson, and apply both against Miller. There was no evidence that Miller and Ferguson acted together, or were in any way accomplices. If one is present, and knowingly and intentionally, and of his malice aforethought, renders assistance in the perpetration of a crime, he is guilty as an accessory. State v. Hollenscheit, 61 Mo. 302; State v. Gooch, 105 Mo. 392; State v. Walker, 98 Mo. 95. But mere consent to the commission of crime, when no aid is given, and no encouragement rendered, does not constitute participation therein. State v. Orick, 106 Mo. 111; State v. Taylor, 134 Mo. 152; State v. Fredricks, 136 Mo. 51; State v. Hays, 105 Mo. 76; State v. Kaiser, 124 Mo. 651.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) There was no error in excluding Gray as a juror. He had scruples against convicting on circumstantial evidence and declared he would not convict defendant on such evidence. Thompson on Trials, sec. 75; State v. West, 69 Mo. 401; Lyles v. State, 41 Texas 72. But even if such had been error it could not be prejudicial to defendant in the absence of any

claim that the juror called to take his place was incompetent. The rejection of a competent juror is not ground for reversal, there being no objection to the jury actually impaneled. West v. Forrest, 22 Mo. 344. (2) Bailey was a competent witness to prove defendant's reputation for truth and veracity. He had been away from Troy, Kansas, for nine years, but had been back frequently. He might never have lived at Troy, and never have known the defendant personally and still be competent to prove defendant's reputation. Underhill on Crim. Evid., p. 292; State v. Turner, 36 S. C. 534. (3) There was no error in the cross-examination of the defendant on matters not testified to by him in chief. Where a defendant is put on trial for murder and asked the question, as in this case, "Did you do the killing?" and the answer is "No," because of the general nature of the answer a very wide range of cross-examination should be allowed. State v. Avery, 113 Mo. 500; People v. Mullings, 83 Cal. 138; State v. West, 95 Mo. 139. (4) The inquiry into defendant's financial condition before the alleged theft of money, or after, or both, was admissible. It was the theory of the State that the theft of the money and the fear of the prosecution therefor was the motive that led to the murder and it was competent for the State to prove all those facts. State v. Seymore, 63 N. W. Rep. 661; Painter v. People, 147 Ill. 444; State v. Pancoast, 67 N. W. Rep. 1052; People v. Harris, 136 N. Y. 423. (5) Instruction numbered 3 does not authorize the jury, either directly or by implication, to consider evidence of Ferguson's guilt as against the defendant; nor does it authorize it to attribute to defendant any act or admission of Ferguson; nor did the court admit any evidence, otherwise improper, on that theory. The fact that Ferguson was not on trial with the defendant makes no difference. State v. Orrick, 106 Mo. 124.

GANTT, P. J.—The defendant was convicted at the November term, 1899, of the circuit court of Holt county, of

State v. Miller.

murder in the first degree of Samuel Crow, and sentenced to be hanged. From that sentence he appeals.

The evidence which is circumstantial disclosed the following facts:

On the morning of March 26, 1899, Samuel Crow, an old man, was found dead in his bed at his home about five miles from the town of Oregon, in Holt county, Missouri. It was perfectly apparent that he had been beaten to death during the night, with a club or other blunt instrument. The defendant and his wife had been living in the same house with the old man until five days before the murder, at which time an estrangement seems to have arisen between him and them, and they removed to a place about one mile north of the town of Oregon, and about three miles from the home of Crow, leaving the old man living alone, as he very seldom left his home, and was seldom visited there, and had but little to do with any of his neighbors. Before moving away, the defendant was asked by a witness to notify Mr. Crow's daughter who lived in the town of Maitland, so that she could arrange for some one to care for her father after the defendant moved away. This the defendant refused to do, saying he had had enough of the old s—— of a b——.

Only a short time before the murder, seventy-five dollars had been stolen from the old man, as he claimed, the money having been taken from a drawer, where he had kept it, the drawer being unlocked by means of a horseshoe nail, a fragment of which was broken off in the lock. The old man made frequent remarks concerning this theft, to the effect that "it was no stranger who took his money." These remarks were sometimes made in defendant's presence, and to him, and at other times he was told about them. The defendant having lived in the house with the old man, he construed those remarks to be directed at him, as shown by his conversation with others on the subject, and it seems that some others who heard what Crow said, understood them in the same way, and, in

fact, defendant was informed that Crow intended to have him indicted as soon as the weather should moderate so that he could make the trip to the county seat.

During this time and on Tuesday, four days before the murder, defendant, according to the testimony of Mrs. Grooms, said to his brother-in-law, Dan Ferguson, and in Mrs. Grooms' hearing, "Dan, if this man says I stole that money, I intend to kill the old son-of-a-bitch."

According to the testimony of William B. Ferguson, the defendant, at about four o'clock in the afternoon preceding the night of the murder, called the witness behind a building in the town of Oregon, and said to him, "You heard the conversation, didn't you, about that money; what the old man said about the money?" and the witness said that he did, and the defendant continued, "I am going to put an end to this money business, before he goes to Maitland, this very night," and the witness said, "Good God, Dave, what are you going to do?" and the defendant said, "I am going to kill him." The witness testified that defendant said further, in the same conversation, "The boys are going to stay all night with me, Dan and Tom; you take the horses on out home, and I am going to slip out there to-night and do it."

That night Dan and Tom Ferguson spent the night with the defendant and the old man was murdered in his bed.

The manner in which the house was entered, namely, by forcing back an old fashioned wooden button on the inside of the door, by means of some sharp instrument, indicates that it was done by some one familiar with the place.

On the day following the murder, there is evidence that the defendant displayed nervousness and agitation. A number of the neighbors and others were gathered at the scene of the tragedy, and a search was begun for the club with which the fatal assault must have been made. It was suggested that some one look in the well, whereupon the defendant said that it would be dangerous to do so, and that there were damps in

the well. His suggestion was ignored and in the well they found an old ax-handle, bearing the marks of blood and flesh. The physician who examined the wounds of the deceased, testified on the trial that they could have been inflicted with that ax-handle.

Defendant, after the murder, made the remark that he was glad he could prove where he was that night. This remark he made not to one, but to many different parties; repeated it frequently.

On behalf of the defendant there was some slight evidence pointing toward William Ferguson as the perpetrator of the crime. On that night he was intoxicated, and in the night, he went out of doors and was gone about fifteen minutes, and it was later discovered that the shirt he wore bore one red stain, and another stain admitted to be blood. His wife testified that the blood stain looked like a large bug had been mashed on his shirt, and the other stain, which was on the wrist-band, resembled brick dust. Mrs. Ferguson further testified that it was not unusual for her husband to leave the house for a few minutes in the night when intoxicated, and that he was not absent from the house long enough to have gone to Crow's house and return.

That defendant was in the town of Oregon until after midnight, and that he returned home together with the other Ferguson boys, is undisputed, and defendant and his wife testify that after he came home he retired and did not leave his bed until the next morning. Dan and Tom Ferguson, who slept in the same house, did not know whether that was true or not, as they slept in the loft of the house, and defendant and his wife in the room below.

Defendant was a witness in the case and the State proved his reputation to be bad, the defendant producing some evidence to the contrary. By way of impeachment it was shown that he had been convicted of assault with intent to kill in Kansas, and had served a term in the penitentiary therefor.

Other facts will be noted in the discussion of the case.

The indictment was as follows, omitting caption:

"In the circuit court of Holt County, Missouri, at the April term thereof, 1899.

"The grand jurors of the State of Missouri, impaneled, sworn and charged to inquire within and for the body of the county of Holt, and State of Missouri, upon their oaths present and charge that David Miller, William Ferguson, Dan Ferguson and Tom Ferguson on the 26th day of March, 1899, at and within said county of Holt, in the said State of Missouri, in and upon one Samuel Crow, then and there being, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought did make and assault, and with a certain ax-handle of the length of three feet and of the heft of one pound which they, the said David Miller, William Ferguson, Dan Ferguson and Tom Ferguson, in their hands then and there had and held, him the said Samuel Crow, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought, did strike, beat and thrust in and upon the head and face of the said Samuel Crow, giving to the said Samuel Crow, then and there with the ax-handle aforesaid, in and upon the head and face of him the said Samuel Crow, divers mortal wounds of which said mortal wounds so inflicted as aforesaid, the said Samuel Crow, then and there instantly died; and so the grand jurors aforesaid upon their oaths aforesaid, do say that the said David Miller, William Ferguson, Dan Ferguson and Tom Ferguson, him the said Samuel Crow, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly, and of their malice aforethought, did kill and murder, against the peace and dignity of the State."

Many grounds are urged for reversal and they will be considered in the order of defendant's brief and argument.

I.   In the examination of jurors to obtain the panel of forty jurors, Alexander Gray, on his *voir dire*, answered that he would not convict a defendant on circumstantial evidence

alone, and thereupon he was excused.  This ruling was assigned as error.

In the matter of selecting a jury the State is as much entitled to an impartial jury as the defendant, and is no more bound to submit its case to one who has predetermined to find against it than is the defendant.  The fact that the statute enumerates certain grounds of disqualification does not exclude other grounds of incompetency.  This has been consistently so ruled by this court since Chouteau v. Pierre, 9 Mo. 3.  [State v. West, 69 Mo. 401; State v. Leabo, 89 Mo. 247; State v. Young, 119 Mo. 495.]  No error was committed in excluding this juror from the panel.

II.  The indictment is assailed on the ground that it does not charge an assault.  This is based upon the words "did make *and* assault."  It is so perfectly obvious that the word "and" was a mere clerical error in the spelling of the word "an," and the implication that the latter is meant instead of the former is so strong, that it would be trifling with a serious matter to hold otherwise.  While intendment can not supply the omission of an indispensable word as was held in State v. Furgerson, 152 Mo. 92, and State v. Rector, 126 Mo. 328, a mere clerical error in the spelling of a word does not vitiate when the whole context discloses the word intended to be used.  [1 Bishop's New Criminal Law, sec. 354; State v. Estis, 70 Mo. loc. cit. 437.]

Moreover, the words "made and" could be stricken out and a perfect indictment, charging an assault, and the weapon with which it was committed would still remain, and this is always allowable.  [State v. Meyers, 99 Mo. 107.]

III.  It is insisted that N. C. Bailey was incompetent to testify to the defendant's general reputation for truth and veracity in the neighborhood of Troy, Kansas, where he and defendant had lived.

The witness had been sheriff of the county in which Troy is situated.  He had known defendant since 1860.  The wit-

ness had moved to St. Joseph nine years previous to the trial, but visited at Troy from time to time, and testified he knew defendant's reputation from what the people in that neighborhood said about him, when witness would visit there. The objection was that the inquiry should be limited to the present, and the court ruled that it was not to be so limited. It will be observed that no objection was made that the witness did not reside in Troy, but simply that the impeachment could only go to present reputation. Evidently the court was right, that it would not be confined to the immediate present.

This court has approved the rejection of testimony that covered a period of over three years, but the question here presented is whether a witness who had known another witness's reputation for truth for nine years and down to the period of the trial is incompetent to speak of such reputation, which has remained the same all the time. We think not. While it must come down to some reasonably recent period, the fact that the witness has known it for years without a change can not surely make it less competent. We do not think this action of the court reversible error.

IV.   Objection is made that the court permitted an improper cross-examination of defendant.

Defendant, called as a witness on his own behalf, was asked, "Did you have anything to do whatever with the murder of Samuel Crow?" He answered, "I did not, or know anything about it in the world."

He was also questioned as to his whereabouts on the night of the killing, who were his companions; when he went home; and what time, and when he heard of the murder.

We have gone carefully through his cross-examination and we think the circuit court carefully guarded his rights. No objection whatever was made to the greater part of his cross-examination. Indeed, it seems to us it was entirely legitimate. Cross-examination is not confined to a mere cate-

gorical review of the matters stated in the direct examination. It is a proper effort to test the truth of that evidence. Of course, under our statute, it must be confined to the subject of the examination in chief, but it is still cross-examination that is permitted, by the statute itself.

V. The court gave the defendant the full benefit of the evidence as to an alibi. It instructed the jury that the defendant was not bound to prove it, but if his evidence raised a reasonable doubt in their minds as to his complicity in the murder, they must acquit him. No error occurred in this respect. No point is made on the form of the instruction.

VI. No valid objection could be made to the evidence tending to show defendant's financial condition just prior to the murder. It was competent to substantiate the theory of the prosecution that the murder had been committed to prevent the exposure of the larceny which the State claimed the deceased had charged against the defendant. The evidence was so meagre on this branch of the case, however, that it could not possibly have influenced the jury in either direction.

VII. The third instruction given by the court is as follows:

"3. The court instructs the jury that, if they believe from the evidence in this cause beyond a reasonable doubt, that, at the county of Holt and State of Missouri, the defendant, David Miller, alone, or that the defendant, David Miller, and one William Ferguson, or either of them and the other present, aiding, abetting or consenting thereto, did, on or about the 26th day of March, 1899, feloniously, willfully, deliberately, premeditatedly, and of his, the defendant's malice aforethought, kill and murder Samuel Crow, in the manner and form charged in the indictment, you should find the defendant guilty of murder in the first degree, and so state in your verdict."

Defendant's objection is that as the indictment did not charge a conspiracy this instruction was misleading; that it

State v. Miller.

authorized the jury to convict defendant on evidence against William Ferguson. We do not think so. The jury were only authorized to convict defendant if they found beyond a reasonable doubt that he alone murdered old man Crow, or that he and William Ferguson did it, or either of them did, the other being present, aiding, abetting, or assisting in the murder. The defendant insisted that William Ferguson was the murderer, and the State claimed that defendant was the guilty party, but if the jury believed William Ferguson was also guilty of participation in the crime, still defendant was only answerable for his own part in the murder. No effort was made to bind defendant as a conspirator, and the instruction is not susceptible of that construction. There was evidence tending to show defendant's guilt and evidence also tending to connect William Ferguson with the crime. The instruction was properly drawn to meet the facts as proven. In no event were the jury to hold defendant for any conduct save his own.

VIII. No error occurred in refusing defendant's three instructions for the reason that the court had fully covered every proposition advanced in them, and in much less objectionable language.

IX. The remaining propositions advanced in the brief and the oral arguments go to the sufficiency of the evidence to sustain a conviction.

Arguments are advanced to show that the conduct of the accused was entirely consistent with innocence and fell far short of pointing inevitably to his guilt.

That Samuel Crow was murdered there can not exist a reasonable doubt in the mind of any rational being who reads this record. Old, feeble, and we might add, apparently friendless, he lived in his little farm house all alone on the night he was slain. Every fact disproved self-destruction, and pointed irresistably to murder. He was unquestionably beaten to death with a club. Under such circumstances the mind in searching for the murderer instinctively begins to look first

for a motive. The deceased was not known to have any enemies, except defendant. A short time prior to this homicide, defendant and his wife lived with the old man. He had charged that somebody had entered a private drawer by the use of a nail, and stolen seventy-five dollars from him. He had significantly said to defendant and William Ferguson, on several occasions, that "no stranger took his money." He evidently reasoned that no stranger would have known that he had it, or where he kept it. So pointed were the insinuations of the old man, that not only defendant, but others, who heard him, construed his remarks as aimed at defendant. For some reason, any way, defendant prepared to move from the house of deceased, about the latter part of March. He informed his brother-in-law, James Ferguson, of his intention to move. Crow was so nearly blind and otherwise decrepit, that James Ferguson immediately asked defendant if he had written to Miss Ella Crow, the only daughter of deceased, to let her know to come and see after her father. Defendant said he had, but in a short time James Ferguson said to him, "Dave, you are sure you wrote to Ella to let her know to come to see after the old gentleman?" Defendant said, "No; I ain't going to. I have got enough of the old son of a bitch." Ella Crow was not notified of his leaving.

On the 21st day of March, before the murder on the 25th, Mrs. Martha Grooms was at the house to which defendant moved, when he left Crow's. She was present when Dave Ferguson brought a load of defendant's furniture from Crow's. She heard Dan talking to defendant and heard defendant say, "Dan, if this man says I stole that money I intend to kill the old son of a bitch." Crow had stated to some one that he was going to Maitland to see if a prosecution could be sustained on his testimony alone, as soon as the weather would permit. This was told to defendant. On the day before the murder defendant and four of the Ferguson boys, his brothers-in-law, were in Oregon. They obtained

State v. Miller.

liquor and from time to time, repaired behind the buildings to drink. Defendant about four o'clock in the afternoon called William Ferguson behind a building, and said, "You heard the conversation, didn't you, about that money; what the old man said about the money?" Ferguson replied he had, and defendant then said, "I am going to put an end to this money business before he goes to Maitland, this very night." Ferguson responded, "Good G——d, Dave, what are you going to do?" Defendant answered, "I am going to kill him." "The boys are going to stay all night with me, Dan and Tom; you take the horses on out home, and I am going to slip out there to night and do it. If you tell, I will kill you." Dan and Tom went home with defendant, and went to bed about one o'clock up stairs, and saw no more of defendant.

The proof showed that the party who committed the crime understood the premises. No violence was done to the doors, but an old fashioned wooden button on the inside was pressed back with a knife or other sharp instrument.

The death of the old man was discovered Sunday morning, and the neighbors crowded to the place. It was suggested that they try to find the club with which he was killed, and some one proposed to examine the old well in the yard, but defendant protested that the well had damps in it and it would be dangerous, but the cover was partly removed and one of the neighbors proffered to go down and get a stick he saw—if they would put a rope around him. This was done, and an axe helve was found in the well, with fresh blood and hair on it. When it was brought out, defendant identified it as one he had taken out of the axe himself while living there. This was clearly the instrument used to murder the old man. Defendant denied that he was near the well, or suggested the danger from the foul gas.

The evidence tended to prove that defendant was unusually nervous before the inquest, and protested to several that he was glad he could prove where he was that night. One gentleman, Mr. Brown, suggested to him he had better

wait until somebody accused him before he went into the proof of his whereabouts that night.

The defendant had been convicted of assault, and served a sentence in the Kansas penitentiary. His reputation for truth and veracity was very bad. He testified that he slept at home and his wife corroborated him fully.

It was for the jury to decide whether old man Crow's money was stolen, and whether he had so talked as to convince defendant he suspected him. If defendant stole the money, it furnished a motive to destroy the evidence. If he did not, there was still the natural resentment at such a charge. If the jury believed the threats that were shown, coming so close to the time of the murder and made directly against the victim, they were certainly cogent proof against him.

The jury saw the witnesses and they weighed this evidence, and believed it.

The crime followed at the time threatened, and defendant's conduct in endeavoring to prevent the discovery of the ax-handle; his nervous protestations of his innocence before accused; the absence of any motive for any other person to commit the crime; the familiarity of the murderer with the premises, certainly pointed to defendant as the murderer. If he was the guilty man, even his alibi smacks strongly of a part of his preconcerted plan. To account for himself until midnight was very clever, but it was not at all impossible for him to have gone three miles and dispatched his victim and returned home before day. It is most significant that robbery could not have been the motive for the murder. Not a thing in the house was disturbed, as would naturally have been done had some one bent on robbery perpetrated the crime. While there was evidence that William Ferguson knew of the intent to murder the old man and left his bed that night, and his absence excited comment at his mother's home, there does not seem to have been any strong suspicion that William had stolen the money. Defendant thought the references were

to him. An ingenious mind may suggest defects in the proof. It was circumstantial, but we do not think it can be said the jury were actuated by passion or prejudice, nor that they were without substantial proofs of defendant's guilt. It was their province to find the facts. The court instructed them "that, in criminal cases where the prosecution rely for a conviction upon circumstantial evidence alone, it is not enough that all the circumstances proved are consistent with and point to the defendant's guilt. To authorize a conviction upon circumstantial evidence alone, the circumstances must not only all be in harmony with the guilt of the accused, but they must be of such character that they can not reasonably be true in the ordinary nature of things and the defendant be innocent."

The *corpus delicti* was clearly established, and the triers of fact have under their oaths said defendant was guilty of the murder. We are not authorized to interfere with their finding in view of the facts shown.

The judgment is affirmed, and the sentence of the law is directed to be executed. *Sherwood* and *Burgess, JJ.,* concur.