[No. 4193. Decided June 26, 1902.]

THE STATE OF WASHINGTON, *Respondent,* v. MANUEL GATES, *Appellant.*

HOMICIDE — CORPUS DELICTI — CIRCUMSTANTIAL EVIDENCE.

In a prosecution for murder, where there is no dispute as to the identity of the body found, the court is justified in submitting the case to the jury, even if in order to establish the other elements of the *corpus delicti,* such as death by violence and the defendant's connection therewith, it should be necessary to depend upon circumstantial evidence.

44—28 WASH.

SAME — EVIDENCE — OPINION OF WITNESS.

A question calling for the opinion of a witness as to whether or not he thought the master of a launch was aboard of her from the manner in which she was being guided, was properly excluded as not being a matter involving skillful knowledge justifying the resort to expert testimony.

SAME — THREATS.

Threats made by the accused a year or more before a homicide are admissible in evidence, even though general in their character and not directed toward the deceased in particular.

SAME — REFUSAL TO PERMIT IMPROPER QUESTIONS — NECESSITY FOR INSTRUCTIONS.

Where the court has refused to permit answers to be given the questions propounded by the prosecution, it is not error for the court to refuse to charge the jury to draw no inferences from such questions.

SAME — HYPOTHETICAL QUESTIONS.

The refusal of the court to allow a witness to be interrogated as to what he would have done under certain circumstances was proper, since the inquiry should be as to the facts actually occurring, and not as to what another would have done under like circumstances.

SAME — REBUTTAL — SELF-SERVING DECLARATIONS.

The fact that the prosecution had put in evidence statements made by the accused, as a part of its case in chief, and not for the purpose of impeaching the accused, who had not at the time appeared as a witness in his own behalf, would not warrant the admission of statements made by the accused to his own witnesses, since such statements would be in the nature of self-serving ones.

SAME — MISCONDUCT OF JUROR — HARMLESS ERROR.

The failure of the court to reprimand a juror, who had asked the court if the defendant could not tell his story in his own way, without interruption of counsel, was not perjudicial error, when no exception or objection was taken to the juror's action, but counsel was permitted to continue his examination without any attention being given by court or counsel to the juror's question.

Appeal from Superior Court, Pacific County.—Hon. WILLIAM O. CHAPMAN, Judge. Affirmed.

*Smith & Gudgel,* for appellant.

*John T. Welsh,* Prosecuting Attorney, and *W. B. Stratton,* Attorney General, for the State.

The opinion of the court was delivered by

HADLEY, J.—Appellant Manuel Gates and one Lauritz Olsen were jointly charged with the crime of murder in the first degree. The information charged, in effect, that on the 29th day of August, 1900, in Pacific county, Washington, appellant and said Olsen killed and murdered one William Beeson, by cutting, stabbing, beating, and mortally wounding him, and by throwing him into the waters of Willapa Harbor. A trial was had, which resulted in a verdict of not guilty as to said Olsen, and of murder in the second degree as to the appellant, Gates. A new trial was granted as to appellant, on the ground of newly discovered evidence, and upon a second trial the court held that, since a verdict of guilty of murder in the second degree had been returned against appellant, he could not be again tried for a higher degree of crime than murder in the second degree. He was accordingly tried for murder in the second degree, and the jury returned a verdict of guilty of manslaughter. Thereafter, the court entered judgment upon the verdict, by which appellant was sentenced to serve a term of six years in the state penitentiary. From said judgment, this appeal is prosecuted.

The deceased, William Beeson, resided with his family at South Bend, Washington. He was a licensed pilot, and was master of the launch "Leonore," which plied the waters of Willapa Harbor and its tributaries. On the morning of the 29th of August, 1900, the launch Leonore, with Captain Beeson as pilot, left the wharf at South Bend for McGowan's cannery, North River. Upon the

arrival of the launch at said cannery, P. J. McGowan,
who owned, or at least controlled the launch, went on
board, and he testified at the trial that there were no other
persons on board besides Captain Beeson and himself.
Beeson was to take McGowan to Nasel and there leave him,
when Beeson was to return with the launch the same day
to South Bend. Upon his return, he was to tow a large
scow to South Bend. The scow was then at the cannery
at North River, and in the morning when McGowan went
aboard, the scow was attached to the launch, and with him-
self and McGowan aboard Beeson proceeded down North
River on his way to Nasel; but, when he arrived at a
certain beacon in the river, he attached the scow to the
beacon, and left it until he should return in the evening.
The launch then proceeded down North River into Wil-
lapa Harbor, and to Nasel. Upon arriving at Nasel, Mc-
Gowan went ashore, and remained, but Beeson started
with the launch on the return trip to South Bend. Mc-
Gowan testified that no other person was aboard during
the trip to Nasel, and that Beeson was alone upon the
launch when it left Nasel. Two other witnesses testified
that in the morning, when the scow was tied to the bea-
con, there were three men on board the launch, but the
witnesses were some distance away and were unable to
identify either of the three except Captain Beeson. It is
the theory of counsel for defense that a third person was
aboard the launch, whose presence was concealed from Mr.
McGowan, since he testified positively that there was no
other person upon the launch or accompanying them, and
the sincerity of his testimony is not questioned. It is
sufficient to say here that no further explanation appears
as to the identity or presence of such third person, if
there was such. On his return trip to South Bend, Bee-

son went up North River to the place where he left the
scow in the morning, detached it from the beacon, and at-
tached it to the starboard side of the launch. This was
about 7:30 o'clock in the evening. He was seen at the
time he detached the scow and started with it down the
river, but no one testified that any other person was seen
about the launch or scow at that time. He proceeded down
the river and into Willapa Harbor. The tide was eb-
bing at the time, and the launch was making its way
against the tide. No witness testified to having seen Bee-
son himself after the launch entered Willapa Harbor and
started toward South Bend, although the launch itself was
seen proceeding regularly on its course, and against the
ebbing tide. The appellant was engaged in fishing at the
time and had his net placed in Willapa Harbor, between
the place where the launch entered the harbor and South
Bend. The aforesaid Olsen was employed by the appel-
lant as a boat puller, and the two were busy about the net
as the launch approached from below. The net was more
than seven hundred feet in length and was spread its en-
tire length across a portion of the channel. Darkness
came on before the launch reached the net, and the launch
ran into it. The webbing became entangled with the pro-
peller, and the launch could proceed no further. Appel-
lant and his companion testified that they called out that
the net was caught, but received no answer; that this was
repeated several times, but no answer came; that appel-
lant then went aboard the launch, and that he looked it
over, and found no person aboard; that they then towed
the launch and scow to South Bend, reaching there about
three o'clock the next morning. A few days afterwards,
the body of Captain Beeson was found floating in the
bay, and an autopsy revealed that his throat had been cut

with a knife or other sharp instrument; that there was a wound over the left eye, and another on the top of the head, which the physicians testified had been made by a blunt instrument; and that blows which were struck hard enough to produce such wounds would produce insensibility. A hole was found between the index finger and the thumb on the left hand, extending to the palmary surface, which the physicians testified might have been made by a gaff hook such as a fisherman uses. The physicians further testified that they examined the lungs, and found no water in them; that the lungs would float; that the wounds in the throat and on the head were the direct cause of death, and that it did not result from drowning. It would seem that Beeson could not have been killed for the purpose of robbery, since money and his watch were found with the body. There was evidence that appellant had said in a general way that any man who should run into his fish net would never run into another one, and also that he had directly threatened to kill Beeson if he should ever run into his net. One witness testified as follows:

"During the latter part of September, 1899, below Reeve's wharf between Rude's wharf and Reeve's wharf, I had a net, and while I was mending on my net Jim Gates came up the way of Rude's sand pile during the time I was knitting or mending. He told me there was a certain man he would like to have run into his net and that that would be the last of him. I stopped knitting. I asked him who it was. He said 'William Beeson.' He said he would have that for an excuse to kill him."

It was also testified that after the disappearance of Beeson, but before the discovery of his body, in a conversation with appellant, the remark was made that Beeson's wife and family had come to South Bend, and that it

was hard on them. To which appellant replied: "Damn him! I don't care for him. I had it in for him, anyhow." Appellant denies the making of the alleged threats, and says he had but little acquaintance with Beeson, and entertained only good will for him. Such is a brief outline of the more material facts and circumstances as they were detailed before the jury.

It is assigned as error that the court denied the motion of appellant, at the close of the state's testimony, that the jury be instructed to bring in a verdict of not guilty. It is urged that the *corpus delicti* was not proven; that there was not satisfactory proof that the deceased was even murdered; and in any event that it is not shown that appellant had an opportunity to kill him. The identity of the body found as that of William Beeson is not disputed; and we think the testimony was sufficient to authorize the jury to find that death resulted from killing, rather than from accident, self-inflicted wounds, or drowning.

"The *corpus delicti* is a compound fact made up of two things: First, the existence of a certain act or result forming the basis of the criminal charge; and second, the existence of criminal agency as the cause of this act or result." 7 Am. & Eng. Enc. Law (2d ed.), p. 861.

The presence of the body and the fact of the killing being established, the next inquiry is, what criminal agency caused the death, or who was the slayer?

"Beyond the death and the violence remain the two inquiries to which the ascertained criminal fact gives rise; who is the slain and who is the slayer; the identity of the one and the agency of the other. These may be established by circumstantial evidence which convinces the conscience of the jury, and because a basis has been furnished upon which inferences may stand and presumptions have strength." *People v. Palmer*, 4 Am. St. Rep. 423, 426 (109 N. Y. 110, 16 N. E. 529).

"We are satisfied that the strict rule contended for by plaintiff in error has been modified by many authorities, and that the weight of authority now is that all of the elements of the *corpus delicti* may be proved by presumptive or circumstantial evidence." *Campbell v. People.* 159 Ill. 9, 22 (42 N. E. 123, 50 Am. St. Rep. 134). ,

While there was no direct and positive proof that appellant killed the deceased, yet, under the rule above stated and which we think is correct, the circumstances in evidence tending to connect appellant with the crime were such as amply justified their submission to the jury.

It is assigned as error that the court sustained an objection to the following question asked by appellant in cross-examination:

"If you were to see Captain Beeson's boat going up the river and you were in a fish boat and you were to show a light in front of him and he would run right towards you and you would be holding your light up until he could get a plain view of you, you knowing Captain Beeson, as you do, would you say Captain Beeson was on that boat, if he run right toward you and tried to run you down?"

It is the theory of the state that Captain Beeson was aboard the launch, controlling and guiding it, when it ran into appellant's net, and that appellant killed him because he ran into the net. But it is the theory of appellant's counsel that, if Beeson was murdered, he had been murdered before the launch ran near to another net further down than appellant's net, the operator of which testified that he saw no one upon the launch as it passed, and received no reply when he called out. Appellant's counsel advance the theory that Beeson may have been murdered further down, and that the murderer was still aboard, guiding the movements of the launch. They therefore sought, by the question above, to elicit the opinion of the witness as to whether Beeson would have guid-

.ed the boat as it was guided, considering the surround-ings. The question involved the opinion of the witness as to whether Beeson was on board the launch at the time. That was a conclusion for the jury to determine from facts detailed, and the witness could not properly testify as to his opinion upon that subject. We think the question did not involve any skillful knowledge in the way of ex-pert testimony. The jury could answer the qustion them-selves, from the facts before them. *State v. Coella,* 8 Wash. 512 (36 Pac. 474). The objection was properly sustained.

It is assigned as error that the court admitted evidence, over objection, of threats made by appellant against Bee-son a year or more before his death, and also threats of a general character, without naming any one in particular, as to what he would do if any one should run into his fish net. Threats against a deceased made by the accused prior to the commission of the alleged offense are com-petent in proof. 1 Bishop, New Criminal Procedure, §§ 1108-1110.

They are admissible as bearing upon the condition of the accused's mind, in the way of showing malice or a motive for the act charged.

"It is immaterial how long before the homicide the threats were made as the remoteness of their utterance goes to their weight and not to their competency." 9 Am. & Eng. Enc. Law, p. 688.

See, also, *State v. Hoyt,* 46 Conn. 330; *Everett v. State,* 62 Ga. 65; *Redd v. State,* 68 Ala. 492. Threats are admissible though not directed toward any particu-lar person. 9 Am. & Eng. Enc. Law, 686, 687; *Moore v. People,* 26 Colo. 213 (57 Pac. 857); *Hopkins v. Commonwealth,* 50 Pa. St. 9 (88 Am. Dec. 518); *An-*

*derson v. State,* 79 Ala. 5; *Brooks v. Commonwealth,* 98 Ky. 143 (37 S. W. 1043); *State v. Harlan,* 130 Mo. 381 (32 S. W. 997).

In *Dixon v. State,* 13 Fla. 636, it was held that, the person killed being a policeman, it was competent to give in evidence on a trial for murder threats made by the accused against policemen, though not particularly against the individual killed. In that case the court says, at page 645:

"Testimony of this character is admissible to show the *animus* of the accused at the time of the commission of the crime, and sometimes tends to identify the accused person, and is always allowed to go to the jury. Its weight is for their consideration. Murder in the first degree is defined by the statute to be the killing of a human being without authority of law, 'with a premeditated design to effect the death of the person killed, or of *any* human being.' In determining the nature and degree of the crime, the intent of the accused is to be ascertained, and this is often found in the character and language of threats made and the circumstances under which they are made."

We think no error was committed in admitting evidence of threats made by the accused in this case. It was for the jury to determine their weight, when considered with all other facts and circumstances in evidence.

Error is further predicated upon the following: Certain questions were asked by the state of a witness about an alleged conversation with appellant three or four days after the death of Beeson; in which appellant expressed a desire to leave this country, and go to Chili. On objection by appellant the court refused to permit the questions to be answered. Appellant's counsel then sought to cross-examine the witness on the same line, which was refused by the court. Thereupon appellant's counsel asked the court to instruct the jury to draw no inferences from

the questions asked by the state's counsel, which instruction the court did not give. We see no error in this. The court refused to permit the examination when objected to, which was in effect saying to the jury that they should draw no inferences. It must be assumed that the jury are able to distinguish between evidence in fact and the mere interrogatories of counsel.

It is assigned as error that the court refused appellant permission to ask his own witness the following question:

"Suppose you would see a fisherman standing on the stern deck of his fish boat with a lantern in his hand; what course would you pursue with regard to that man if you were close to him?"

This was not error. It would have been improper to permit the witness to state what he would have done under given circumstances. The essential inquiry is as to the facts which occurred, and not as to what another would have done under like circumstances.

Error is assigned upon the refusal of the court to permit certain witnesses for appellant to testify as to what appellant had said relative to finding the body of the deceased, Beeson. Witnesses for the state had testified as to remarks made by appellant upon that subject. This testimony was given at a time when it was not known that appellant would become a witness in his own behalf, and was not offered for the purposes of impeachment, but as a part of the state's case bearing upon appellant's connection with the crime. The court offered to permit the witness to be examined concerning all conversations about which the state's witness had testified, but refused to permit cross-examination as to what appellant had said to his own witness at other times. This, we think, was right.

Such statements would be in the nature of self-serving ones, and their admission was properly denied.

While appellant was upon the witness stand, he was telling his story in a narrative form, when one of his counsel interrupted him. A juror then asked the court if appellant could not be allowed to tell his story in his own way, without interruption by counsel. It is urged as error that the court did not reprimand the juror; it being contended that the juror thus protested against an examination of appellant by his counsel. Appellant's counsel continued the examination. The court said nothing, and was not requested to say anything. No objection or exception was noted. The question of the juror was simply asked, and it remained unanswered by the court, except for the fact that counsel were permitted to continue the examination. The silence of the court, taken in connection with what followed, was probably a more effective reprimand than would have been a lecture to the juror. The court's conduct was at least not prejudicial error.

The remaining assignments of error, like those already discussed, are based upon alleged errors of the court pertaining to the introduction of evidence. We are satisfied that no material error was committed. No error is assigned upon the court's instructions. The jury having found the appellant guilty, we see no reason for disturbing the verdict, and the judgment is affirmed.

REAVIS, C. J., and FULLERTON, WHITE, ANDERS, MOUNT and DUNBAR, JJ., concur.