[No. 27200. Department Two. December 1, 1938.]

THE STATE OF WASHINGTON, *Respondent,* v. DEL RICHARDSON *et al., Appellants.*[1]

[1]Reported in 84 P. (2d) 699.

158

*Jerry Finch, John F. Garvin,* and *J. E. Bakken,* for appellants.

*B. Gray Warner, John M. Schermer,* and *Harry A. Bowen,* for respondent.

SIMPSON, J.—The defendants were charged by information with murder in the first degree. Del Richardson was charged with the actual commission of the crime, and Claire Richardson with aiding and abetting him in its commission.

The case came on for trial, and the jury returned a verdict of guilty, with a finding that the death penalty

be not inflicted. Motion for a new trial having been made and overruled, judgment and sentence were entered, from which the defendants appeal.

The following are appellants' assignments of error: (a) In holding that the *corpus delicti* had been proven; (b) in submitting to the jury the question of first degree murder; (c) admission of evidence; (d) denial of motions to strike evidence; and (e) misconduct of the prosecuting attorney.

Appellants contend that the *corpus delicti* was sought to be shown by proof of motive on the part of appellants, and was, in fact, not proved in any manner.

The evidence, aside from that relating to motive, is essentially as follows: Appellants are brother and sister. Early in the morning of Thursday, October 28, 1937; the appellants and deceased registered at a Seattle hotel under the names of Mr. and Mrs. Brumbaugh and Miss Claire Brumbaugh, and were assigned to rooms 406 and 407, which had a connecting bathroom. At two o'clock Friday morning, the hotel clerk went to the rooms because other guests in the hotel had complained of noises there. He heard sobbing when he reached the room. Appellant Del Richardson appeared at the door and said his wife had been drinking. About six o'clock, appellants left in their car and returned about two hours later. They then ordered three bottles of beer.

Saturday morning, between twelve and two o'clock, guests in the hotel heard a woman crying and saying, "I never did anything like that in my life and you can't make me. You can go ahead and shove me out the window, I don't care." A short time after, the same woman screamed and said, "Don't do that." At about 1:30 a. m., the manager heard a loud scream from one of the two rooms. He went to the door of room 406,

and, after knocking twice, was admitted by Claire Richardson. Going into room 407 through the bathroom, he saw Del Richardson standing about two feet from the bed, where a woman was lying with the bedclothes covering her so that only the top of her head could be seen. She did not make a sound. Del Richardson was told that, if there was any more disturbance, the police would be called, and he promised to keep quiet.

At approximately two o'clock the same morning, the night clerk went to the rooms, and when he approached, he heard a girl sobbing. The door was opened by Del Richardson, who apologized for the noise that had been made. At 6:15 the same morning, the clerk again went to room 406 and was met by Claire Richardson, who was told that the parties in the rooms would have to vacate because of the disturbance they had made. Shortly afterward, Claire Richardson asked the clerk to call her a taxi. At 9:15 a. m., she took the taxicab and went to a drug store, stopping on the way at a rooming house. Upon returning to the hotel, she talked over the long distance telephone to Barbara Adams, proprietor of the West Rooms, in Portland, Oregon, saying that "Pat" had fallen into a tub of hot water and might die, and asked Miss Adams to send her some money. Later, she called and made the same request.

Shortly after the telephone call, beer and some food were sent to the rooms. During the morning, Claire Richardson asked the maid at the hotel to give her some sheets and pillow cases, which were taken to the rooms. In room 406, the maid saw Del Richardson standing by the bed, upon which a naked young woman was lying. The woman was breathing heavily, as if snoring. After leaving the sheets, the maid went to room 407 and made the bed in that room.

At twelve o'clock noon, Claire Richardson called Dr. Carl A. Stromberg, who arrived shortly thereafter and found the deceased severely burned and unconscious. The doctor instructed appellant Del Richardson to call an ambulance, and, on being told by appellant that deceased was an addict, he gave her one-sixth of a grain of morphine. The deceased was admitted to Harborview hospital at three o'clock on the afternoon of October 30th, and from four o'clock on the same day she was under the care of Dr. Hilton W. Rose, a burn specialist, until she died November 3rd. Dr. Rose made an examination of Mrs. Richardson and testified that her left cheek was bruised, her left eye was almost swollen shut, the upper part of her left forehead was bruised, as was the right side of her arm, her nose was severely bruised, there were many bruises on her left arm, and forty per cent of her body was burned to the extent of first and second degree burns. Practically all of her fingernails were missing. A small strip of flesh around each wrist was not burned. While in Harborview hospital, the deceased was given the best treatment known to medical science, but did not regain consciousness, although the specialist testified that the burns themselves were not sufficient to justify unconsciousness for that period. Dr. Rose went to appellant Del Richardson, told him his wife was in a critical condition, and asked to be told what had happened so that the best treatment might be given her. Appellant answered that he didn't know and had nothing to say.

After death, the deceased's brain was examined by brain specialists, who found two bruises on the outside of the brain, one on the left side and the other over the right forehead. The head had suffered three separate concussions, one over the left ear, one over the right forehead, and the other at the back of the skull.

The doctors testified that the three distinct blows of a violent nature must have been made by a dull instrument. The attending physician concluded the primary cause of death was bronchial pneumonia, though she had no pneumonia when she entered the hospital. The contributing causes of the death were burns and concussions.

An examination of the rooms occupied by appellants and deceased, after they had left, disclosed them to be in bad disorder. In room 407, the sheets were torn in half, and the bed pad was damp and discolored. In room 406, the bed was soiled, and there was blood on it. Two small pools of blood, broken beer bottles, and other glass were on the floor. Blood spots were found in the bathroom, fingernails were found in the room, and two wet neckties, a fingernail, and a silk stocking were found on the ground directly beneath the window of room 407. The testimony showed that the weather had been dry.

A test of the hot water in the room showed that it reached a temperature of 140° after it had been allowed to run two or three inches in the bottom of the bathtub, and that the body would have to remain in water of that temperature at least five minutes in order to make the burns shown on the body of the deceased. After a thorough examination Dr. Rose testified that, from the location of the burns on deceased's arm and a small unburned area on the small of her back, her arms must have been tied while she was in the water and that certain insulating material such as the wet ties must have been bound around her wrists.

Appellant Del Richardson, in explaining the burns on the body of his wife to the police, said that she was a narcotic addict, and had become violent and tried to jump out of the window; that, at about two o'clock in the morning, she had gone into the bathroom for the

purpose of taking a bath; he heard her scream and went in and pulled her out of the bathtub. Claire Richardson explained that the deceased was a narcotic addict, and that she made the noise in the hotel rooms at a time when she was refused the opportunity of securing any narcotics.

The doctor testified that, after he had made a narcotic injection, her reaction was negative. In other words, that the reaction was that of one who had never been addicted to the use of narcotics in any form. The statements made by both appellants to the police were to the effect that no one else had been in their rooms during the period of time they were there except the hotel manager and the clerk who came to remonstrate about the noise.

██ This court, in the case of *State v. Gates,* 28 Wash. 689, 69 Pac. 385, approved the following definition of *corpus delicti* found in 7 Am. & Eng. Enc. Law (2d ed.), 861:

"The *corpus delicti* is a compound fact made up of two things: First, the existence of a certain act or result forming the basis of the criminal charge; and second, the existence of criminal agency as the cause of this act or result."

The meaning of the term is well stated in 13 R. C .L. 737, as follows:

"The discovery and identification of a dead body or its remains as that of a person charged to have been slain having been introduced to establish the basis of the corpus delicti, the next step in the process, the one which serves to complete the proof of the indispensable preliminary fact, is to show that the death has been occasioned by the criminal act or agency of another person."

Appellants contend that Mrs. Richardson died of pneumonia which was not caused by the concussions

and burns, and that the death might well have been occasioned by a mistake in treatment at the hospital.

Dr. Rose, in answer to the question as to whether the patient would have died without the contributing factors of concussions and burns, stated that, when one suffers burns,

"The most frequent cause of death is bronchial pneumonia, whether it be due to the organisms already in the lung which was due to the fact she has been burned have incubated and caused the bronchial pneumonia,— it might have been due to the fact she was overexposed to the air, and that in treatment will cause it, or aspirating fluids as I have mentioned before."

At another time, Dr. Rose stated that a patient would not ordinarily die so soon from burns like those received by deceased, and that pneumonia is the most frequent complication with burns.

Dr. Donald Erickson, who assisted Dr. Rose, testified:

"The primary cause of death as the patient was signed on the chart was bronchial pneumonia, associated with second degree burns. In other words, the patient had a complicating factor there which speeded up her exodus."

In our opinion, this contention is not well founded. In the case of *State v. Baruth*, 47 Wash. 283, 91 Pac. 977, this court stated:

"Where one unlawfully inflicts upon the person of another a wound calculated to endanger or destroy life, it is no defense to a charge of murder where death ensues to show that the wounded person might have recovered if the wound had been more skillfully treated. Even unskillful or negligent treatment of the wound on the part of the wounded person or his physicians, which may have aggravated the wound and contributed to the death, does not relieve the assailant from liabililty. He must show that the negligent and unskillful treatment was the sole cause of death, before he can escape the consequences of his unlawful act on

this ground. *State v. Edgerton,* 100 Iowa 63, 69 N. W. 280; *State v. Landgraf,* 95 Mo. 97, 8 S. W. 237, 6 Am. St. 26; *Daughdrill v. State,* 113 Ala. 7, 21 South. 378; *Sharp v. State,* 51 Ark. 147, 10 S. W. 228, 14 Am. St. 27; *State v. Strong,* 153 Mo. 548, 55 S. W. 78; *Denman v. State,* 15 Neb. 138, 17 N. W. 347; Wharton, Homicide (3d ed.), § 35."

See, also, 8 A. L. R. 516.

The facts testified to by the various witnesses and the circumstances concerning the events leading up to Mrs. Richardson's death clearly show that some person killed her.

 There was sufficient evidence to justify the court in denying appellant's challenge to the sufficiency of the evidence at the close of the state's case. *Timmerman v. Territory of Washington,* 3 Wash. Ter. 445, 17 Pac. 624; *State v. Anderson,* 132 Wash. 130, 231 Pac. 456. The denial of the motion to dismiss at the close of all of the evidence was fortified by the testimony of appellants' witness Dr. Royal D. Tracey, who testified that it was impossible for Mrs. Richardson to have recovered from the brain injuries.

 The next error urged by appellants is the introduction of evidence presented by the state to prove a motive for the doing of the acts constituting the crime.

The evidence introduced to prove the motive may be summarized as follows: Deceased and Claire Richardson were prostitutes, and appellant a man who consorted with and lived on the earnings of such women. Mrs. Richardson was educated in a private school in the city of San Francisco and left her home at the instance of appellant Del Richardson. Del Richardson and deceased lived together as man and wife for two years in Los Angeles, at which place Claire Richardson became acquainted with deceased. Later, appellants lived together as man and wife in two different

hotels in San Francisco, and deceased was a visitor at their hotel rooms. Afterward, all three went to Oregon, the girls living and working in several houses of prostitution, and were visited at various times by appellant Del Richardson.

In August, 1937, the appellants became acquainted with a girl by the name of Mary Wenger. They took her into a house of prostitution at Portland, where she was visited by appellant Del Richardson, who promised that he would marry her and they would take a trip to Europe. Deceased was acquainted with these various women and the operators of the houses, and was in contact with all of them at various times in company with the appellants.

Shortly before the journey to Seattle, the appellants and deceased were suspected of being engaged in narcotic traffic and were interrogated by Federal narcotic agents in Portland. Appellant Del Richardson served a short term in jail on a vagrancy charge. October 18, 1937, deceased and Del Richardson were married in the city of Vancouver, Washington, appellant Claire Richardson being one of the witnesses at the ceremony. Thereafter, they went back to Portland, Oregon, spent a day or two there, and then went to Seattle.

Criminal motive is the inducement existing in the minds of persons causing them, first, to intend, and afterward to commit crime.

The reasons for the introduction of evidence to prove motive are well stated in *O'Brien v. Commonwealth*, 89 Ky. 354, 12 S. W. 471, as follows:

"Necessarily, where the commission of crime can be shown only by proof of circumstances, the evidence should be allowed to take a wide range, otherwise the guilty person would often go unpunished. It is true there must be some connection between the fact to be proven and the circumstances offered in support of it, yet any fact which is necessary to introduce or explain

another, or which afforded an opportunity for any transaction which is in issue, or shows facilities or motives for the commission of the crime, may be proven. Even evidence tending to prove a distinct offense is, therefore, admissible, if it shows facilities or motives for the commission of the one in question. The purpose is to weave a net about the guilty, and often this can no more be done by proof of a single circumstance than the building of a house with a single brick."

The rule relative to the admission of evidence to prove a motive has been settled in this state by our decision in *State v. Gaines*, 144 Wash. 446, 258 Pac. 508, as follows:

"The general rule is that, when the defendant is charged with a particular crime, evidence of a collateral crime is inadmissible. This rule, however, is subject to a number of exceptions, one of which is that evidence of the collateral crime is proper for the purpose of showing motive. Before evidence of the collateral crime can be received, there must be some causal relation or natural connection between that crime and the one for which the defendant is being tried. *State v. Hakon*, 21 N. D. 133, 129 N. W. 234; *State v. Beam*, 184 N. C. 730, 115 S. E. 176. Evidence of the existence of a motive, or a lack thereof, for the commission of any particular crime is often of much importance in determining whether the defendant committed the crime with which he is charged, and this is especially true where, as in this case, the state relies upon circumstantial evidence."

The question for decision in the case at bar is whether the evidence admitted comes within the exception noted. Is there a causal connection between the proved unlawful and lewd acts of appellants and the crime charged in the information?

Deceased and appellant Del Richardson started to live together three years prior to the trial, at which time appellant Claire Richardson became acquainted with the deceased. Later, appellants lived together as

man and wife. Appellant Del Richardson intended to marry Mary Wenger. He was suspected of, and questioned about, being in the narcotic trade. He secured his living from the earnings of prostitutes. All of these things, with the possible exception of the promise of marriage to the Wenger girl, were known to his wife of a few days.

In *State v. Gaines, supra,* the record disclosed that deceased and her father, the defendant, had at various times occupied the same bed. Their relations were incestuous, and on the day of the murder they had quarreled. In speaking of that evidence, this court stated:

"In cases of this kind, the prior relations between the deceased and the accused have a direct bearing upon the motive inducing the crime, and the fact that the evidence may tend to prove a collateral crime is no reason why it should not be received. The object of the trial is to arrive at the truth, and all facts which are competent, relevant and material should be made to appear, in order that a just determination of the cause may be had."

"In prosecutions for homicide, as in criminal prosecutions generally, evidence to show motive is competent, and considerable latitude is allowed in its introduction. When proof has been made of the corpus delicti, all facts and circumstances that tend to show motive on the part of the accused are relevant. The conduct, attitude, relations, and feelings of the parties toward each other, in connection with the other facts and circumstances surrounding the act, may be shown." I Wharton's Criminal Evidence (11th ed.), 302, § 253.

Again on page 310, § 256, the author says:

"Facts and circumstances are relevant, on a homicide charge, to show that the motive for a homicide was the concealment of a prior crime, when they tend to prove that the accused was guilty of the prior crime, and knew that he was suspected, or was likely to be

discovered as the guilty party, by the deceased, or that the deceased had knowledge of the prior crime."

Of like import are the following cases: *State v. Kent*, 5 N. D. 516, 67 N. W. 1052, 35 L. R. A. 518; *Smith v. State*, 44 Tex. Crim. 53, 68 S. W. 267; *O'Boyle v. Commonwealth*, 100 Va. 785, 40 S. E. 121; *Frank v. State*, 141 Ga. 243, 80 S. E. 1016, cited in *State v. Gaines, supra; State v. Reed*, 53 Kan. 767, 37 Pac. 174, 42 Am. St. 322; *O'Brien v. Commonwealth*, 89 Ky. 354, 12 S. W. 471; *State v. Watkins*, 9 Conn. 47, 21 Am. Dec. 712; *People v. Molineux*, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193; *State v. Miller*, 156 Mo. 76, 56 S. W. 907; and *Robinson v. State*, 114 Ga. 56, 39 S. E. 862.

As in other cases concerning the admission of evidence, much must be left to the discretion of the trial court.

"In conducting an inquiry to prove that a husband had a motive for killing his wife much must be left to the discretion of the trial judge. It is not necessary that each piece of evidence to be admissible should be sufficient to prove the motive. It is enough if it has some probative value." *Commonwealth v. Mercier*, 257 Mass. 353, 153 N. E. 834.

The supreme court of the United States in the case of *Moore v. United States*, 150 U. S. 57, 37 L. Ed. 996, 14 S. Ct. 26, stated:

"There is a certain discretion on the part of the trial judge which a court of errors will not interfere with, unless it manifestly appear that the testimony has no legitimate bearing upon the question at issue, and is calculated to prejudice the accused in the minds of the jurors."

The question of whether he was actuated by the fear of exposal by his new wife of his unlawful acts, or love of another, or jealousy on the part of his sister, who aided and abetted him, was proper and necessary to be presented to the jury.

Appellants were guilty of other crimes of which deceased knew, and it was proper to receive evidence concerning them to show a motive on their part for the killing of Mrs. Richardson.

■ ˙ The next error urged is in allowing Dr. Rose to testify that the hands of deceased were tied when she was placed in the bathtub. After Mrs. Richardson had been taken to the hospital, her body was covered with tannic acid and silver nitrate in order properly to treat the burns; tannic acid and silver nitrate, when spread on a body, turns black the burned area, but leaves the unburned portions in their natural color. Pictures of the deceased, taken after the autopsy had been performed, showed some white parts around the wrists, a triangular white area on her left side, with the apex extending to the center of the small of her back.

Appellants argue that the evidence given by Dr. Rose invaded the province of the jury, in that there was no occasion for expert testimony, for the reason that the facts and circumstances were already before the jury and adequately pictured and described, and their bearing upon the issues could be estimated without any special knowledge, experience, or training, and cite *Pearson v. Alaska Pacific Steamship Co.*, 51 Wash. 560, 99 Pac. 753, 130 Am. St. 1117, in which case we approved a quotation from 17 Cyc. 41, as follows:

"When all relevant facts can be or have been introduced before the jury, and the latter are able to deduce a reasonable inference from them, no reason exists for receiving opinion evidence, and it is inadmissible."

In passing upon the admissibility of such evidence, this court has held that much is left to the discretion of·the trial court, and his rulings will not be interfered with except in case of abuse of that discretion. The

view is expressed in *State v. Smails,* 63 Wash. 172, 115 Pac. 82, as follows:

"The line of demarkation between matters that fall within the knowledge of mankind generally and matters that are the subject of special and peculiar knowledge cannot, from the nature of things, be very accurately drawn. The one, of necessity, shades into the other, and hence, even though the extremes of the opposing rules may be definitely marked and error predicated thereon easy of determination, the trial judge must have something of discretion whether he will or will not admit opinion evidence when the line of demarkation between these rules is approached."

In *State v. Mooradian,* 132 Wash. 37, 231 Pac. 24, it was said:

"A like error is assigned respecting the admission of testimony of a Japanese doctor, who described the injuries sustained by the child and gave his opinion as to how they were, or might have been, inflicted. The witness qualified as an expert, and it seems to be the rule that an expert may, after describing the nature of a wound, give such opinion as was here given. *Shaughnessy v. Holt,* 236 Ill. 485, 86 N. E. 256, 21 L. R. A. (N. S.) 826; *Strever v. Woodard,* 160 Iowa 332, 141 N. W. 931, 46 L. R. A. (N. S.) 644; *Jerome v. United R. Co. of St. Louis,* 155 Mo. App. 202, 134 S. W. 107; *Metropolitan Insurance Co. v. Wagner,* 50 Tex. Civ. App. 223, 109 S. W. 1120."

The additional objection made by appellant is to a demonstration by the witness of how he concluded the white stripes were left on the wrists, side, and back of deceased. Dr. Rose made that demonstration by placing the neckties received in evidence about the wrists of the prosecuting attorney to illustrate in what position the deceased was when she was immersed in water in the bathtub. The action of the witness was simply an exhibition by him to illustrate the meaning of the testimony he had given. It explained the pic-

tures and the position in which the body of the deceased was placed in order to obtain the results shown by the pictures.

Such illustrations should be based as nearly as possible upon conditions and circumstances substantially like those existing at the time of the commission of the offense.

"It is permissible for a witness, in describing a certain incident, to accompany his testimony with pantomime. He will be permitted to place the parties in the position they occupied at the time of the crime, in order to make his testimony plain. And, within the discretion of the court, he may illustrate his testimony upon physical objects placed before the jury." 3 Wharton's Criminal Evidence (11th ed.), 2147, § 1280.

The admissibility of experiments, illustrations, and other demonstrative evidence before a jury, throwing light upon the manner in which a crime was committed, rests in the discretion of the trial court. 16 C. J. 894; *State v. Scruggs,* 165 La. 842, 116 So. 206; *State v. Tucker,* 58 N. D. 82, 224 N. W. 878; *State v. Winters,* 102 Vt. 36, 145 Atl. 413; *Hudson v. State,* 46 Ga. App. 668, 168 S. E. 912; *Riley v. State,* 73 P. (2d) (Ariz.) 96; *People v. Mondshine,* 132 Cal. App. 395, 22 P. (2d) 779; *Peoples v. Commonwealth,* 147 Va. 692, 137 S. E. 603.

■ Finally, appellants complain of misconduct on the part of the prosecuting attorney in including in his opening statement to the jury a recital of the evidence that was afterwards introduced to prove motive. The evidence being admissible, the opening statement of the state's attorney to the jury concerning what he expected to prove was proper.

The record does not disclose reversible error.

The judgment is affirmed.

STEINERT, C. J., BEALS, MILLARD, and GERAGHTY, JJ., concur.