## STATE OF NORTH DAKOTA, Respondent, v. FRANCIS TUCKER, Appellant.

(224 N. W. 878.)

Opinion filed January 2, 1929.   Rehearing denied April 22, 1929.

*M. A. Hildreth* and *F. S. Thomas,* for appellant.

*George F. Shafer,* Attorney General, *William C. Green,* Special Assistant Attorney General, and *E. M. Warren,* State's Attorney, for respondent.

BIRDZELL, J. Francis Tucker was tried in the district court of LaMoure county for the murder of one Hans C. Bjone and was convicted. He appeals to this court from the judgment of conviction and from an order denying his motion for a new trial.

Hans C. Bjone during his lifetime was the cashier of the Farmers & Merchants Bank of Verona. He was in sole charge of the bank except for such supervision as was exercised by two uncles, who lived in the vicinity of Verona and owned the controlling interest in the bank. He was a bachelor and had a living room in the bank building where he slept and sometimes cooked for himself. On the morning of March 1, 1927, the bank did not open as usual. After this fact had been noted by several, one of the townsmen upon trying the front door discovered that it was not locked. Thereupon he forced the door open and found that one nail had been driven in the frame and one below the door into the threshhold to hold it shut. After an examination of the banking room and of the living room it was ascertained that the vault door was locked. This was soon opened by a former employee of the bank, who remembered the combination, and just inside the vault was found the body of Hans C. Bjone. There were five bullet wounds in the head. Upon a later examination it developed that the bullets were not all of the same caliber. Three bullets were later extracted from the head of the deceased. Two were .22 caliber and one .25 caliber. In checking up the cash assets of the bank it was discovered that some $3,600 had been taken between February 28th and March 1st. The back door of the building was equipped with a Yale lock which locked automatically when the door was closed. There was

a storm door outside the rear door, which was kept closed by a hook and fastened from the inside. This storm door was open on the morning of March 1st. These main facts which were patent upon a casual examination indicated that some one actuated by the motive of robbery had shot the cashier, locked his body in the vault, nailed the front door shut, taken the cash and escaped through the rear door. The evidence to connect the defendant with the crime is circumstantial and will require a more adequate statement in that portion of this opinion which will deal with its sufficiency.

The defendant was indicted by a grand jury in LaMoure county on May 6, 1927. He later appeared and filed an affidavit of prejudice against the court and against the county. The presiding judge, Hon. George M. McKenna, thereafter on June 14, 1927, made an order removing the action for further proceedings and for trial to Cass county, to which county the records and proceedings were transmitted. On September 28, 1927, the defendant was again indicted by a grand jury in LaMoure county for the same crime as that charged in the indictment of May 6th. After the return of the second indictment an ex parte application, dated October 1, 1927, was made by the attorneys for the prosecution for an order of dismissal of the indictment of May 6th and it was accordingly dismissed by an order signed by the district judge presiding in Cass county. The order of dismissal was signed October 6, 1927, and recites as reasons that a subsequent indictment had been returned charging the defendant in the first indictment with the same crime as that charged therein and that the state had elected to proceed upon the second indictment, that returned on September 28th. The record shows some very questionable proceedings with reference to the empanelling of the first grand jury, which go to the validity of the indictment. It therefore suggests the existence of substantial reasons for procuring a second indictment. The defendant was never required to plead to the first indictment.

The record is voluminous. There are seventy-six assignments of error and twenty-three additional assignments on the instructions of the court to the jury in addition to the specifications of the insufficiency of the evidence. The first seven assignments are grouped for argument by the appellant under the head of jurisdiction of the district court of LaMoure county to proceed with the trial of the defendant

under the second indictment. The power of the district court of Cass county to dismiss the prosecution under the first indictment is also questioned. The proceedings disclose the theory of the prosecution to be that there may be more than one indictment against a person for the same offense and that a prior indictment may be dismissed and a defendant tried under a subsequent indictment regardless of any proceedings that may have been taken under a prior indictment to secure a change of the place of trial; whereas, it is the theory of the defendant and appellant that after proceedings are taken on a prior indictment, to secure a change of judge and a change of place of trial in a criminal case, there can be no subsequent proceedings looking toward a prosecution for the same offense in the county where the indictment was procured, particularly where a second indictment is procured in circumstances that might deprive the defendant of the benefit of the change previously obtained.

When the case was called for trial in LaMoure county the defendant was permitted to withdraw his plea of not guilty and to file written objections to the jurisdiction of the court, together with a motion to quash. These objections and the motion were overruled. In denying the motion, the court expressed the reservation that the defendant should have time and opportunity to make application for a change of venue in the second action if he should desire. The court also overruled a demurrer to the indictment, whereupon the defendant interposed a plea of not guilty and the trial proceeded.

The appellant argues that that portion of the ruling of the trial judge, wherein the court offered to give the defendant time to make an application to change the venue of the trial under the second indictment, could not operate to secure to him the enjoyment of such a right for the reason that there was no opportunity to file the affidavit "not less than five days before the opening day of the term," as the statute requires. Sess. Laws 1927, chap. 215. Whatever substance there is in this argument is contained in the suggestion that through the action of the court the defendant lost the right to apply for a change of place of trial under the second indictment. The record shows that during a special term of the district court of LaMoure county, on October 3, 1927, the defendant appeared and filed a demurrer to the second indictment, in which, among other grounds, it was recited that the court

had no jurisdiction of the offense on account of the change of place of trial previously secured under the first indictment. It shows that the demurrer was overruled and that the defendant was arraigned. On advice of counsel he declined to plead and a plea of not guilty was entered for him, whereupon the special term of the court was that day adjourned sine die. It further appears that the regular term of the district court at which the defendant was tried was convened on the 1st day of November, 1927. It appears, then, that there was ample time after the defendant had been held to answer to the district court under the second indictment for him to have availed himself of the statutory procedure for obtaining a change of place of trial, even construing the statute as appellant construes it. Hence, there is no merit in this suggestion. We pass, then, to the main question on this branch of the case, namely: After a defendant has been indicted for a specific offense and has secured a change of the place of trial under the statute, may he be re-indicted for the same offense and tried in the county from which the change had previously been secured?

When a defendant has not been placed in jeopardy no reason is apparent why the state may not take whatever proceedings are deemed advisable looking toward a trial for the offense. It should not be necessary for the state to proceed to trial upon an indictment which it conceives to be faulty when the fault, if any, can readily be corrected by a second indictment. We can see no substantial reason for any distinction between a criminal and a civil action in this regard and the common law recognizes no such distinction. State v. Faulks, 97 N. J. L. 408, 117 Atl. 476; O'Meara v. State, 17 Ohio St. 515; Reed v. Territory, 1 Okla. Crim. Rep. 481, 129 Am. St. Rep. 861, 98 Pac. 583; Com. v. Cody, 165 Mass. 133, 42 N. E. 575; 1 Bishop, New Crim. Proc. § 770; 31 C. J. 598. The rule is thus expressed in C. J. supra: "It is generally held that a grand jury may find a valid indictment notwithstanding another indictment is pending against accused for the same offense, and the pendency of the other indictment, where there has been no conviction or jeopardy thereon, is not ground for a plea either in abatement or in bar of the second indictment, or for motion in arrest of judgment thereon, although as a rule accused can be tried or put in jeopardy on only one." In the absence of some statutory provision depriving the authorities of the county

of the venue of the crime of jurisdiction to return a second indictment, it is clear that they could proceed to exercise the power which the law gives. A statute authorizing a change of venue or a change of place of trial does not in itself preclude a second indictment in the county of original jurisdiction after a .change has been effected. 31 C. J. 599; State v. Billings, 140 Mo. 193, 41 S. W. 778; State v. Goddard, 162 Mo. 198, 62 S. W. 697. If reasons still exist at the time of the second indictment, which, in the view of the defendant, indicate that he can not have a fair trial in the county, it should not be assumed that his application would not be properly acted upon and determined if presented. State v. Billings, supra; State v. Patterson, 73 Mo. 695; State ex rel. English v. Normile, 108 Mo. 121, 18 S. W. 975.

The principal authority relied upon by counsel for the appellant to support the contention that the district court of LaMoure county had no jurisdiction to take any further steps looking toward the prosecution of the defendant after the change of venue had been taken to Cass county is Smith v. Com. 95 Ky. 322, 25 S. W. 106. As this seems to be a leading case, we have not only examined the decision with care but we have resorted to the statutes of Kentucky to ascertain, if possible, its true basis. In that case the defendant had been indicted in the Perry county circuit court. A change of venue had been taken by the commonwealth under an act approved in 1890, transferring the cause to the Clark county circuit court. While that indictment was pending the grand jury of Perry county again indicted the defendant for the same offense and after unsuccessful attempts to have the proceedings under the second indictment dismissed the defendant procured a change under the same statute to the circuit court of Bell county where he again attempted to raise the same jurisdictional questions. He was there convicted and the conviction was reversed. It seems that the act under which the change of venue was secured formed a part of the statutes governing the subject of changes of venue in criminal cases. See §§ 1109 to 1126, inclusive, Kentucky Statutes (Barbour & Carroll), 1894. These statutes contain a provision which is rather unusual in that it authorizes new indictments to be found by the grand jury of the county to which the removal is made. · Section 1117 of the Kentucky statutes, supra, reads:

"The court to which the removal is so made shall have the same

jurisdiction to dispose of the case as the court has from which it was removed; and if the indictment be quashed or nolle prosequi entered, *a new indictment may be found, from time to time, by a grand jury of the county to which the removal is made,* and the same prosecuted until the case is finally disposed of, ·as though the offense had been committed in that county." (Italics are ours.)

See Parker v. Com. 12 Bush, 191; Jennings v. Com. 13 Ky. L. Rep. 79, 16 S. W. 348.

When the Kentucky court, then, held that after a change of venue had been taken from the county in which the indictment was returned the original circuit court lost all jurisdiction over the *subject-matter of the indictment* and that the subsequent proceedings, both in the original county and a third county to which another change from the first county had been taken, were void for want of jurisdiction in the court in which they were had and, further, that the circuit court of the county to which the venue had been first changed had full and complete jurisdiction of the case, it was not determining the question before it upon common-law principles. The court must have had in mind the provisions of the statute above quoted which authorized a complete disposition in the county to which the change was taken, even to the extent of authorizing a new indictment *there* if necessary.

And the Georgia case of Johnston v. State, 118 Ga. 310, 45 S. E. 381, 46 S. E. 488, decided on facts regarded by that court as substantially parallel with those in the Kentucky case, doubtless represents a sound construction of the Georgia statutes involved. However, we have no such statute as that quoted from Kentucky which purports to vest in the court to which a criminal cause is sent, upon an affidavit of prejudice being filed, complete jurisdiction to dispose of the subject matter, even to the extent of authorizing another information or indictment to be filed or presented originally in such county. Our statute merely authorizes a change of the place of trial. But, as to amending informations, in the county to which a change has been taken, see State v. Woods, 24 N. D. 156, 139 N. W. 321. A trial is merely one step in a criminal action. Comp. Laws 1913, § 10,390. A change of the place of trial is not a change of the venue of the subject-matter, of the offense itself. The statute here involved does not purport to

deal with eventualities attendant upon the quashing or dismissal of an indictment in the manner here shown or the securing of a second one.

Section 11,179, Compiled Laws of 1913, provides:

"The procedure, practice and pleadings in the district courts of this state, in criminal actions or in matters of a criminal nature, not specially provided for in this code, shall be in accordance with the procedure, practice and pleadings under the common law."

Therefore, these matters must be disposed of on common law principles contrary to the contentions of the appellant.

Nor is the case at bar parallel to that of Keefe v. District Ct. 16 Wyo. 381, 94 Pac. 459. In that case the defendant had been informed against in Carbon county for murder. Upon his application a change of place of trial had been secured transferring the cause to Albany county under a statute which made it the duty of the county attorney of the latter county to prosecute the case as though it had originated in that county. A second indictment was procured in Carbon county and the defendant brought an original proceeding for prohibition in the supreme court. Both indictments were pending at the time of the application for the writ and, inasmuch as each was in charge of a different prosecuting officer, the defendant was subject to the hazard of having to defend both prosecutions. In the case at bar the prosecution was in charge of the same officers throughout and approximately thirty days before the defendant was brought to trial the first indictment had been dismissed. Comp. Laws 1913, § 11,169. The consent of the prisoner is not essential to a valid dismissal (1 Bishop, New Crim. Proc. 4th ed. § 1390), and his presence is not required. Lizotte v. Dloska, 200 Mass. 327–329, 86 N. E. 774.

The next ten assignments deal with the refusal of the court to give instructions requested by the defendant on the question of good character. The instruction given on this subject was:

"Some testimony has been introduced in this case with reference to the good reputation of the defendant for peace and quietude prior to the time of the alleged offense, and you are advised that evidence of good reputation is evidence in favor of the defendant possessing it. Such evidence is proper and competent and is to be considered by you with all the other evidence in the case, that is, the other facts and circumstances as you may find them. This is upon the theory that one

who has established, by his conduct in the community in which he resides, a good reputation for peace and quietude is less liable to commit a crime than one who has not, by such conduct, established such reputation."

This charge was substantially that contained in defendant's request Number 6. Numerous other requests for instructions upon this subject were made, however, most of which stated substantially that evidence of good character alone might be sufficient to create in the minds of the jury a reasonable doubt as to the guilt of the defendant. The instruction given is, in our opinion, a clear statement of the law. It advised the jury of the precise reason why such evidence is admitted in a criminal case. It drew their attention to the evidence. It required it to be considered along with the other evidence in the case and left it to the jury to say whether upon the whole evidence a reasonable doubt existed. Generally speaking, an instruction is properly refused which unduly emphasizes particular issues or which singles out and emphasizes particular testimony or parts of the evidence and gives them undue prominence. 16 C. J. 1038. We know of no reason why this rule should not be applicable to evidence of reputation. See Sweet v. State, 75 Neb. 263, 106 N. W. 31. While it may be true in particular cases that a reasonable doubt may arise upon such evidence alone, we are of the opinion, notwithstanding People v. Bonier, 179 N. Y. 315, 103 Am. St. Rep. 880, 72 N. E. 226; People v. Conrow, 200 N. Y. 356, 93 N. E. 943 (the authorities chiefly relied upon by the appellant), that an adequate instruction upon the law for the guidance of the jury does not call for any such specific charge as to the possible effect of the evidence. It is clearly sufficient to state the legal basis for its reception, to instruct upon the duty to consider all of the evidence and to charge the jury to give the defendant the benefit of any reasonable doubt arising thereon.

Assignments of error numbered 18 to 34, inclusive (except 31), are predicated upon the refusal of instructions upon the subject of circumstantial evidence. On that subject the court charged:

"The connection of the defendant with the killing of Hans C. Bjone, as charged in the indictment, may lawfully be proved by what we call circumstantial evidence. It is common knowledge that ordinarily men who commit crimes do not do so openly, in the light of day, in the

presence of witnesses. On the other hand the criminal usually exercises his utmost judgment and efforts to conceal the crime and its commission and to avoid its detection. If only those crimes which are seen and can therefore be proved by direct evidence were possible of proof in a court of justice a large proportion of crimes would go undetected and the perpetrators go unpunished. So the rule of law permitting proof of the connection of a person with a crime by proving facts, which we call circumstances, tending so to connect him with the commission of such crime, arose out of a public necessity and it is now lawful to prove the connection of a defendant charged with crime with the commission of such crime by circumstantial evidence. This means that the state may prove facts, which we call circumstances, which tend to connect the defendant with the commission of the crime. And if each such circumstance is proved to your satisfaction beyond a reasonable doubt and all such circumstances, when taken together, convince your minds beyond a reasonable doubt of the guilt of the defendant, then a verdict of guilty is warranted even though the evidence tending to connect the defendant with the commission of the crime be entirely circumstantial. The circumstances proved by the state tending to connect the defendant with the commission of the crime must be consistent with each other. That means that any circumstance which is contradictory of any other circumstance or which does not fit in to the whole array of circumstances cannot be considered by the jury. And all of the circumstances taken together, with all reasonable, legitimate inferences to be drawn therefrom, must not only be consistent with the guilt of the defendant but must exclude every other reasonable theory arising from the evidence in this case, upon which theory the defendant may be innocent. In other words, gentlemen, if you find from the evidence beyond a reasonable doubt that Hans C. Bjonc was murdered at the time and place charged in the indictment, then the next question for you to consider is, 'Does the evidence convince me, beyond a reasonable doubt that the defendant, Francis Tucker, killed him?' And before you will be warranted in saying that you are so convinced the circumstances shown in the evidence must be such as to exclude every reasonable theory arising from the evidence except that of the guilt of the defendant. If upon a consideration of all the evidence you may say that all of the facts and circumstances proven may be true and yet,

upon any reasonable theory arising from the evidence the defendant may still be innocent, then the circumstantial evidence is not sufficient to warrant a conviction. On the other hand if you can say and feel that you are convinced by the evidence, beyond a reasonable doubt, of the guilt of the defendant, and there is no reasonable theory arising from the evidence by which the defendant may be innocent, then it will be your duty to find the defendant guilty, although the evidence tending to connect the defendant with the commission of the crime be all circumstantial. And you should not go outside of the evidence or indulge your imaginations to find theories of innocence but such theories, if any, must arise from a full, fair, candid consideration of all of the evidence, both for the state and for the defendant."

The court further instructed as to the meaning of "reasonable doubt" and stated that it must arise either from the evidence or from a lack of evidence in the case, and it must be one as to the ultimate fact of the defendant's guilt.

We think this instruction is clear and embodies the law on the subject of circumstantial evidence as completely as any instruction requested by the defendant. The only criticism we would make of the charge is a tendency to vagueness of meaning in this portion: "The circumstances proved by the state tending to connect the defendant with the commission of the crime must be consistent with each other. *That means that any circumstance which is contradictory of any other circumstance or which does not fit in to the whole array of circumstances cannot be considered by the jury.*" The court should not have said "that any circumstance which is contradictory of any other circumstance or which does not fit in to the whole array of circumstances cannot be considered by the jury," because, obviously, every circumstance having a sufficiently direct bearing upon the guilt or innocence of the defendant and which is supported by evidence should be considered. But when this sentence is interpreted in the light of the statements preceding and following, it doubtless conveyed to the jury the thought, which was evidently intended to be conveyed, that the circumstances warranting a conviction must be consistent with each other and that, if there was any circumstance contradicting the array of circumstances pointing to guilt, it would break the chain of proof upon which the inference depends.

Counsel cite to us the charge of Chief Justice Shaw in the case of Com. v. Webster, 5 Cush. 295, 52 Am. Dec. 711. That charge is too lengthy to be reproduced here, but at the conclusion of what was said as to circumstantial evidence, it was summed up by reference "to a few obvious and well established rules, suggested by experience, to be applied to the reception and effect of circumstantial evidence." Com. v. Webster, suprá, (page 317). These rules were stated, in part, as follows:

"The first is, that the several circumstances upon which the conclusion depends must be fully established by proof. They are facts from which the main fact is to be inferred; and they are to be proved by competent evidence, and by the same weight and force of evidence, as if each one were itself the main fact in issue. . . .

"The next rule to which I ask attention is, that all the facts proved must be consistent with each other, and with the main fact sought to be proved. When a fact has occurred, with a series of circumstances preceding, accompanying, and following it, we know that these must all have been once consistent with each other; otherwise the fact would not have been possible. Therefore, if any one fact necessary to the conclusion is wholly inconsistent with the hypothesis of the guilt of the accused, it breaks the chain of circumstantial evidence upon which the inference depends; and, however plausible or apparently conclusive the other circumstances may be, the charge must fail. . . .

"Another rule is, that the circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty, that the accused, and no one else, committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis. . . ."

The charge given in the instant case conforms to the substance of the charge quoted and as given by that learned jurist and meets with our approval.

There are a number of other assignments based upon the charge, some of which are so obviously without merit as to require no discussion. We shall, therefore, consider only such assignments as appear to us to have merit. On the question of the degree of the crime, the court instructed:

"Under our Code the crime of murder is divided into two degrees, known as: One, Murder in the first degree; or, two, Murder in the second degree.

"Every murder perpetrated by means of poison, or by lying in wait, or by torture, or by other willful, deliberate or premeditated killing, or in committing or attempting to commit any robbery or burglary, shall be deemed murder in the first degree; all other kinds of murder shall be deemed murder in the second degree.

Every person convicted of murder in the first degree shall be imprisoned in the penitentiary for life.

"The jury before whom any person prosecuted for murder is tried shall, if they find such person guilty thereof, determine by their verdict whether it is murder in the first degree or murder in the second degree. But in that connection I charge you that in this case there is no evidence which will warrant the jury in finding the defendant guilty of murder in the second degree; and upon the evidence in this case you must find the defendant guilty of murder in the first degree or you must acquit him.

"In cases of this kind, if a verdict of guilty of murder in the first degree be found by the jury, they must in their verdict determine the punishment to be imposed upon the defendant; and the statutes of this State, so far as this case is concerned, fix that punishment as imprisonment in the penitentiary for life."

It is said that the court erred by invading the province of the jury to the extent of removing from them the function, which was theirs, to determine, in case they found the defendant guilty, that he was guilty of murder in the second degree or of a lesser included offense. Without commenting upon the circumstances in which the record shows this instruction to have been given, we are of the opinion that no error was committed. It is true that the statute (§ 9476, Compiled Laws of 1913) provides that the jury before whom any person prosecuted for murder is tried, shall, if they find such person guilty thereof, determine by their verdict whether it is murder in the first degree

or murder in the second degree; also that they shall (§ 9477) fix and determine the punishment to be inflicted within the limits prescribed by law. While the jury were instructed as to the substance of § 9476, they were also charged that under the evidence in this case they must either find the defendant guilty of murder· in the first degree or acquit him. There was no request by the defendant for any other charge in this connection. We have previously held (State v. Woods, 24 N. D. 156, 139 N. W. 321; State v. Martin, 54 N. D. 840, 211 N. W. 585; State v. Murbach, 55 N. D. 846, 215 N. W. 552) that it is not error to fail to instruct upon lesser or included offenses in these circumstances. And see State v. Haynes, 7 N. D. 352, 75 N. W. 267; State v. Glass, 29 N. D. 620, 151 N. W. 229; also, cases cited from other jurisdictions, 12 L.R.A.(N.S.) at pages 937 and 938, note. We can see no reason why—especially in the absence of a request—the court should instruct the jury that they might return a verdict for some lesser offense than that which the evidence conclusively shows was committed. The degrees of murder are defined in the statute (§ 9469), and where the evidence shows that the essential elements of murder in the first degree were all present and there is no evidence of murder in the second degree, there is no question of fact for the jury to determine touching the degree and it is not error for the court to say so. The mere fact that the jury has the power to disregard its oath in this respect does not lessen the duty of the court to instruct the jury as to the law. The statute making it the duty of the jury to find the degree of the offense and to fix the punishment, presupposes that the jury would be guided by the law and by the evidence. In our opinion, the statute should not be read as giving to the defendant *the right* to have the *power* of the jury exercised in his favor without warrant either in law or in fact. We are aware of the contrary decisions on this question, many of which will be found cited in the note to State v. Phinney, 13 Idaho, 307, 12 L.R.A. (N.S.) 935, 89 Pac. 634, 12 Ann. Cas. 1079, but we have long been committed in this jurisdiction to the views hereinabove expressed.

In defining the crime of murder in the first degree, the court omitted those parts of the definition contained in § 9469, supra, which under the evidence had no application to the case in hand. It was said by the court that one would be guilty of murder in the first degree if the murder was accomplished by one committing or attempting to commit rob-

bery or burglary, omitting several other enumerated crimes. Later in the instruction, in submitting the essential issues to the jury, the court submitted that the defendant would be guilty of murder in the first degree if the murder was committed while committing or attempting to commit *a* felony. It is said that these instructions are erroneous in that the complete definition of murder in the first degree should have been given and that in submitting the latter alternative to the jury, the felonies enumerated in the statute should have been named rather than to have permitted the jury to find the defendant guilty if they found the murder to have been committed while the defendant was committing or attempting to commit *a* felony. If in defining murder in the first degree the court had given the complete statutory definition, it should further have restricted the definition to the issues in the case as defined by the pleadings and brought it within the evidence. State v. Anderson, 10 Or. 448. See 1 Blashfield's Instructions to Juries, 2d ed. §§ 81 and 82. It is not error to so define a crime as to fit the definition to the evidence in the case. That is, where the crime defined may be committed in numerous ways, it is not error to define it as being committed if accomplished in the manner in which, within the definition, the evidence shows the particular crime to have been committed. There was no evidence that the unlawful killing in this case occurred while the assailant was committing or attempting to commit any sodomy, rape, mayhem, or arson. All the evidence showed that if it was committed while any other crime was attempted or in process of being committed, such other crime was robbery or burglary. While this limitation might well have been carried into the other portion of the charge, we think, in view of the evidence, it was clearly not prejudicial to omit the limitation in this case. Since, under the charge taken as a whole, the only felony or felonies in process of commission or attempted commission at the time of the killing were robbery or burglary, it would be wholly fanciful to assume that the jury, in considering the instructions, could have had any other felony in mind.

In this long record, consisting of approximately fifteen hundred pages, there are comparatively few objections to evidence. It shows, however, that the rights of the defendant were carefully safeguarded by competent counsel throughout the trial. Upon such important questions as the time of day when the defendant was seen in the bank, when he entered

the pool room just before starting home, when he went to the feed mill and made a payment on account, when he left the village for home and when he arrived at home, witnesses, of course, gave their best judgment as to the time, but each was required to state upon what observations that judgment was based, so that it was removed from the realm of mere conjecture or speculation. We think the record shows that the testimony of each witness in this respect was based upon his own knowledge and observations and we do not regard it as necessary to discuss separately each assignment of error based upon the rulings of the court in admitting or rejecting such testimony.

It is earnestly contended by the appellant that the court erred in sustaining an objection to an offer of proof in which were recited the incidents that are supposed to have taken place when the defendant was taken to the sheriff's office in LaMoure on March 19th and there questioned by the sheriff, by a detective named Krenning, and by the state's attorney. Before the offer was made, the general question had been asked the defendant on direct examination with reference to this occasion as follows: "And what did they do to you?" This was objected to as immaterial and in the course of the objection the prosecutor stated: "Any testimony contradicting any of the testimony of the state's witness is perfectly proper. . . . The jury is entitled to know anything about any matters which have been testified about—but a long story of this kind wouldn't be material or relevant," whereupon the attorney for the defendant said "There is some testimony from Mr. Cruden (the sheriff) about whether he searched him and the amount of money he found and things of that sort. What we want to know by this witness is the exact transaction—whom he talked to—what was said and what was done—and the whole story from start to finish. . . . I will state that we are not offering it to contradict in any way the testimony the State may have offered in reference to that. It isn't impeachment or anything of that kind—simply what occurred—show what these people said to him and what his experiences have been and what he did himself, on each one of these occasions. . . ." The Court: "Well, your theory is that if any of those—they were offers or applications of what is commonly called third degree—that it ought to be heard here—in this trial." (defendant's attorney) Mr. Murphy: "Not necessarily the third degree feature—because as I understand that, that means the

exercise of extreme methods in order to extort admissions. But I want to show the method of asking questions before the grand jury and especially down in the sheriff's office—and he testified that he never had had any experience with public officers— and they took him in there and went through him the way they did." The Court: "Well you may ask him about anything that appears in evidence—from the testimony of any person connected with the state's side of the case." Mr. Murphy: "Well, let's see if I understand you correctly. I am limited only to testimony that may have been given by the state's witnesses with reference to the general transaction?" The Court: "No, that isn't what I mean. You may contradict or affirm, by this witness, anything that appears in the case—to have originated at this time you inquire about." The general question was asked again and objection made which was sustained with the announcement to the defendant's attorney that he would be allowed to inquire with reference to anything that appears in evidence as to what was said or what was done for the purpose of contradicting, affirming or explaining. Thereupon the offer of proof was submitted and an objection was made to all except "that on March 19th, 1927, Mr. Cruden, Mr. Warren and Mr. Krenning took Mr. Tucker in the sheriff's office and searched him, took his boots off and his jacket and went all through him." The court sustained the objection and announced: "But you will not be precluded, Mr. Murphy, from eliciting from this witness, if you desire, anything in connection with any of the testimony—on the part of the state—as to anything done in connection with this matter," whereupon the defendant's attorney proceeded to examine him with reference to what had taken place on that occasion, covering the search, and the defendant gave an explanation as to why he had misstated the amount of money he had on his person. In our opinion the record does not show that the defendant was restricted in giving his testimony concerning what had taken place in the sheriff's office on the day in question. He was permitted to explain fully any fact which had then been disclosed and introduced in evidence and which might have had the effect of an admission.

It is contended that the court erred in sustaining the objection of the prosecution to an offer of proof submitted while the witness James Collihan was on the stand to the effect that on or about October 27, 1927, he met one B. J. Knudson in Fargo, North Dakota; had had a

conversation with him in which Knudson had stated, in substance, that he had seen a certain man with a crooked mouth in Verona a few days before the Bjone homicide and that, if Collihan would get information to show that this man was in Verona, he (Knudson) would see that he got not less than $3,500; also, to a further offer of proof by the same witness that about a year preceding the trial Knudson had asked him to get a man to burn an elevator and stated that he would pay him $1,000 to do so. Objections were sustained on the ground that no foundation had been laid for the offers of proof; that is, that proper foundations for impeachment had not been laid. The record shows that while Knudson was on the witness stand, having been called by the prosecution, and while under cross-examination by the defendant's attorney he was asked concerning his acquaintance with Collihan as to having seen him and Roland Magill, the defendant's father-in-law, in Fargo about the 20th of October. The witness admitted that he had made a statement to Collihan at that time that there was a certain man with a crooked face working in a taxicab office in Fargo, but he denied that he stated he had seen that man and another man in Verona a few days before the murder. But he stated that he had said a man of that type had been seen there. He denied he had told Collihan and Magill that he had seen him there a few days before the homicide. The question was reduced to specific statements to both Collihan and Magill and the witness denied having made such statements. It is now contended, as it was upon the trial, that a proper foundation had been laid for impeaching the witness Knudson and that the court erred in not allowing the impeachment to be completed by permitting Collihan to testify to the statements made. It clearly appears that the supposed foundation for the impeachment was laid during the cross-examination of the witness Knudson concerning facts which at most were only collateral to those covered in his direct examination or facts which had a bearing only on his credibility. On direct examination Knudson had not testified either with reference to a crooked faced man being in Verona shortly before the homicide; nor had he stated that he had ever said so. Any inquiry, then, concerning what he might have said regarding this matter was not only outside the scope of his direct examination but was hearsay as to whether or not such an individual was in Verona at the time. No rule is better established than that when questions are

asked for the sole purpose of affecting the credibility of a witness and asked in such a way that his credibility will be affected by a negative or affirmative answer to the specific question—aside from facts showing interest or bias (State v. Malmberg, 14 N. D. 523, 105 N. W. 614) —the examiner cannot extend the inquiry further by attempting to disprove the truth of the answer, and that a witness may not be impeached by showing that he has at other times made statements contrary to those so made on the witness stand or been guilty of conduct which he has, as a witness, denied. As was said by this court in the Kent case (State v. Kent (State v. Pancoast) 5 N. D. 516–558, 35 L.R.A. 518, 67 N. W. 1052), "Another objection absolutely fatal if this cross-examination was for the purpose of affecting credibility only was the introduction of Exhibit P. Nothing is better settled than that, where a witness is asked as to collateral crimes for this purpose, his answers are absolutely conclusive on the party asking. 3 Rice, Ev. § 222, and cases cited. Nor does it change the rule that the denial comes by the written admission of the witness. The principle is not different from introducing another witness to prove oral admissions."

The rule applicable to the offer to prove what Knudson might have said to Collihan is stated by 6 Jones, Ev. 2d ed. § 2399, as follows:

". . . A party cannot, by drawing out on cross-examination statements by a witness which are irrelevant and collateral to the principal issues, gain the right to contradict such testimony by showing inconsistent statements of the witnesses at other times.

"Witnesses may often be questioned, on cross-examination, as to matters collateral to the issue for the purpose of testing their credibility. But it is a well-settled rule that witnesses cannot be interrogated as to matters wholly irrelevant, merely for the purpose of contradicting them by other evidence. Hence, if irrelevant questions are asked and answered, the answer cannot be contradicted by the cross-examiner. If a party inquires of a witness as to immaterial matters, he must take the answer, and cannot raise an issue thereon by introducing evidence to contradict it. . . ."

See also State v. Haynes, 7 N. D. 352, 75 N. W. 267; Schmidt v. Stone, 50 N. D. 91, 194 N. W. 917; 5 Jones, Ev. § 2367; 2 Wigmore, Ev. 2d ed. §§ 1001, 1003 and 1023. The test of materiality for the purpose of applying this rule is: Could the fact, as to which error is

predicated, have been shown in evidence for any purpose independently of the contradiction? Jones, Ev. § 2400. In this case it could not have been shown independently that Knudson had made such a statement. There was no error in excluding the offers of proof. What is said above likewise disposes of the assignments of error predicated upon objections sustained to questions asked of Magill in which it was sought to complete the impeachment of Knudson in the same manner.

It is urged that it was error to permit the witness Walden to produce from his pockets while upon the witness stand 144 silver dollars and twenty dollars in half dollars. The sole purpose for which this was done was to furnish a demonstration to the jury as to the bulk of this amount of specie so as to convey more accurate impressions as to the facility with which it could be carried or concealed on one's person. In view of the testimony with reference to the quantity of silver in the bank on the evening of the homicide and of its disappearance in the manner indicated by the evidence, we can see no error in allowing this bit of demonstrative proof.

We have endeavored to discuss the rulings on evidence that seemed to us to have the most merit and we do not deem it either necessary or proper to discuss additional assignments, but we have carefully considered all of them and are of the opinion that no error was committed in the reception and exclusion of evidence.

It is said that the evidence in the instant case does not come up to the high standard that courts have laid down as a basis for conviction of murder in the first degree upon circumstantial evidence. The appellant argues that the evidence fails to sustain the conviction in that it does not tend sufficiently to prove: (1) that the defendant had the opportunity to commit the crime: (2) that he was actuated by the motive of robbery; and (3) that it fails to exclude the probability of other persons being guilty of the offense. The most important question to be considered in connection with the first proposition is whether or not the evidence shows the defendant to have been present at about the time of the commission of the homicide. There is abundant evidence that the defendant was the last person seen in the bank or the last person in the bank on February 28th. The defendant in his testimony admits that he was the last person seen in the bank. We will examine the testimony with a view to the time that he was there. Bjone had gone to a lunch room

in the hotel at about 3 : 30 p. m. and was back at the bank approximately 4 :00 p. m. At about this time Eli Utecht was in the bank and saw the defendant there. While at the hotel Bjone received from an employee a small check for deposit. This check was not entered on that day's business and was later found on the spindle, indicating that the books of the bank had been balanced for the day before he had gone to lunch. There is also additional evidence of this fact. One Clifford Aahl, a school boy, went into the bank to cash a check for his mother at about 4 :15. He testified that he heard the train whistle as he was going to the bank, and the station agent testified that the train came in at 4 :20 p. m. and left at 4 :21 on that day, and he had a record of the fact. When Aahl went into the bank one Huntington was in the bank getting a twenty dollar bill changed. Tucker was not there at this time. Huntington fixed the time in this way : A customer had purchased a cigar in his pool room, giving him a twenty dollar bill to pay for it. Huntington being busy, requested the customer to get the bill changed, but the latter explained that he had to catch the train and would not have time, whereupon Huntington noticed it was a quarter past four and the train about due. He thereupon changed the bill, almost exhausting his silver, and went to the bank a few minutes afterwards to get the bill changed. The train brought the afternoon mail into the village and, it being the last day of the month, the mail contained the electric light bills of various citizens. One Carl Otto Freiss watched the train pull out of the yards and after it had pulled out he put on his overcoat, walked three blocks to the postoffice, got his mail, including his light bill, went into the Farmers & Merchants Bank, got a blank and gave a check for the bill. While there he met John Noonan, who likewise paid his bill. According to these witnesses they left the bank at from twenty-five to twenty minutes before five o'clock and at that time the defendant was sitting in the front office of the bank, reading a paper, and remained there after they left. These were the last persons shown to have left the bank. At ten minutes and forty-five seconds past five o'clock, according to the long distance telephone device for timing messages, Mrs. Lena Kortie finished a long distance telephone conversation with a Mrs. Burgess at Fargo. She talked two or three minutes with the operator of the station, walked across the street and met one William Shadler who had been waiting for her. They together walked

toward the bank where Shadler stopped for the purpose of entering the bank but, on observing that the curtain on the front door of the bank was drawn and hearing a pounding noise therein like somebody driving a nail with a hammer, he did not attempt to go in. He fixed the time of this occurrence, independent of the telephone conversation, at 5:15. This had been brought to his attention when he testified at the coroner's inquest. Mrs. Kortie went on to a hardware store where she met one Fred Taylor and told him about the telephone conversation. He immediately went to the postoffice which was next door to the bank, got his light bill, and as he went by the bank he thought he would stop and pay it, but, noticing that the curtain was drawn, he believed it to be closed and walked away. It was shown that the curtains were not ordinarily drawn during the day while the cashier was in the bank. Bjone was shown to have been unusually regular as to the time of eating his evening meal at the hotel. He was there uniformly at six o'clock or a few minutes before.

There is, then, abundant evidence that the defendant was in the bank at from twenty-five to twenty minutes to five o'clock when no one was there except him and Bjone; that between this time and 5:15 the curtains of the bank had been drawn in such a manner as to indicate that the bank was closed, and a pounding had been heard like the driving of a nail with a hammer. The defendant testified that he did not remain in the bank more than five minutes after Friess and Noonan left; that he went to a store and got some meat, then to the pool hall where he had left his coat, put the coat on, came back on to the street where he was accosted by a youth named Davis who desired to ride with him; that the latter went into a store, got a box of groceries that had already been put up and the two started for home. His testimony is indefinite as to whether after leaving the bank he had gone towards the stockyards to ascertain whether arrangements were being made for his father-in-law, Magill, to ship stock the next day. The time element as to another circumstance is important here. The testimony of both the state and the defendant shows that the defendant paid Knudson at the feed mill a hundred dollars in currency, on account, as he was leaving town. Knudson ran an elevator and a feed mill, the two being a short distance apart. There was a watch in the elevator office that had been set that morning. One Carl Nelson, who had been at the eleva-

tor, testified that he looked at the watch as he was leaving and it was ten minutes to six; that Knudson had left the elevator for the feed mill just ahead of him. William Shadler, who had left the elevator before Nelson, had driven three miles in his car and was home at five minutes to six. Knudson testified that he left the elevator for the feed mill at about ten minutes to six. Tucker testified that as he was driving toward the feed mill he saw Knudson going to the mill; that he stopped there and paid him the hundred dollars. Knudson further testified that after receiving the hundred dollars he went back to the elevator office at about 6:13 and left for home at about 6:20. There are other witnesses whose testimony likewise tends strongly to fix the time of Tucker's visit to the mill on his way out of town at about six o'clock.

Upon the trial the defense sought to show that the defendant had arrived at his home, a distance of six or six and a half miles from Verona, at approximately the time fixed by the above witnesses for the transaction between Knudson and Tucker at the feed mill, but the credibility of the witnesses and the weight of the testimony is primarily for the jury. Upon appeal we can only determine whether or not the evidence is such that reasonable men may be convinced thereon beyond a reasonable doubt. State v. Gummer, 51 N. D. 445, 200 N. W. 20. It should be borne in mind that on this question of time, both as to when the defendant was last seen in the bank and when he appeared at the mill and paid the hundred dollars on account, the witnesses for the state were those whose attention was called to the matter during the investigation following the homicide very soon after the occurrence and that they based their evidence upon events and circumstances which ordinarily are fixed with a rather high degree of certainty. The evidence, in our judgment, clearly warrants the jury in believing beyond a reasonable doubt that the defendant was in the bank at approximately twenty minutes to five o'clock and that he did not leave the village for home until about ten minutes before six o'clock and, hence, that he had ample opportunity to have committed the crime in question.

As to his being actuated by the motive of robbery, the circumstances show in the first place that the motive for the crime was obviously robbery or burglary. As to whether the defendant was actuated by that motive, there is abundant evidence as to the condition of his finances previously. It would serve no good purpose to recite this evidence in de-

tail. Suffice it to say, that during the investigation which followed both the defendant and his wife, the latter a woman of good education and refinement, voluntarily gave to the authorities an account of their financial transactions extending over a considerable period of time. The facts ascertained from this source, as well as their sales of grain, poultry, livestock and produce, and the expenditures which the state was able to show they had made, show that they had little money on hand at the time the offense was committed. The evidence in this case shows the expenditures by the defendant from the time of the homicide down to the time of the trial to be substantially in excess of any income he had and of any surplus on hand, and expenditures for purposes that were unusual with him. It likewise shows a change from his previous methods of moderate purchases on credit to more generous purchases for cash; also, that there is considerable and vital conflict between evidence given during the investigation and evidence given upon the trial on behalf of the defendant concerning these matters. We think the evidence clearly sufficient to show that the motive for the homicide in question was robbery or burglary and that the defendant was actuated by that motive.

There are many circumstances to indicate that the evidence excludes a probability of other persons committing the offense. The defendant was the last person seen in the bank. Soon after he was seen there the bank was observed to be in the condition in which it was found the next morning when the crime was discovered. Bjone had kept two or more guns in the bank. He had carried one of these, a .25 Colt automatic. A clip containing cartridges for it was found in his left trousers pocket. One gun had been ordinarily kept by him on a shelf under the teller's window. This gun was found there. The .25 was not found. The circumstances in which the body was found indicate that Bjone had been sitting in the vault near the door sorting checks or doing other work when he was approached from the side and a shot fired back of his left ear that came out through the forehead. He was lying on his left side. The other shots had been fired into the right side of the head, apparently, as he was lying on the floor and at least one of them apparently was from the victim's own gun. There was no evidence of struggle and nothing to indicate that Bjone's suspicions had been aroused by the approach of an assailant. All these circumstances tend strongly, there-

fore, to indicate that the crime was not committed by an itinerant highwayman or a bank robber, who would undertake a job of this sort armed with his own weapons. Not to attempt to state all the circumstances tending in this direction, another circumstance is the fact that fifty dollars in gold and about eighty dollars in silver was left in a till from which some silver had been extracted; another is, at the time of day the evidence shows this offense was committed a stranger could scarcely have come into the village, committed the offense and escaped unobserved; and still another is, that no one else was observed to have had the opportunity for the commission of the offense that the defendant was shown to have had. On the whole record we cannot say that the evidence did not sufficiently exclude the probability of other persons committing the offense and on this record we think that the questions of fact were for the jury. Our opinion is that the evidence is not such that we can say that reasonable men might not conclude therefrom, beyond a reasonable doubt, that the defendant committed the crime.

It is clear that the newly discovered evidence is cumulative merely of considerable evidence of a similar character that was given upon the trial. Neither do the affidavits show that this evidence might not have been readily available to the defendant had he been diligent or had he desired to produce it.

The allegations regarding the misconduct of a juror were controverted not only by a strong denial of the juror himself but by an affidavit of another juror indicating that the charge of misconduct sprang from one strongly biased in the defendant's favor. We are satisfied that the motion for a new trial was properly overruled.

There being no error in the record, the judgment and order appealed from must be affirmed. It is so ordered.

BURKE, Ch. J., and NUESSLE and CHRISTIANSON, JJ., and PUGH, Dist. J., concur.

BURR, J., did not participate; Honorable THOMAS H. PUGH, Judge of the Sixth Judicial District, sitting in his stead.